[No. S108751. June 2, 2003.]

EDGAR WINTER et al., Plaintiffs and Appellants, v.
DC COMICS et al., Defendants and Respondents.

**COUNSEL**

Gipson, Hoffman & Pancione, Julia L. Ross, Corey J. Spivey; Greenberg Traurig and Vincent H. Chieffo for Plaintiffs and Appellants.

Victoria T. Vaught and Steven Springer for National Organization for Albinism and Hypopigmentation as Amicus Curiae on behalf of Plaintiffs and Appellants.

Weissmann, Wolff, Bergman, Coleman & Silverman, Weissmann, Wolff, Bergman, Coleman, Silverman & Holmes, Weissmann, Wolff, Bergman, Coleman, Grodin & Evall, Michael Bergman, Anjani Mandavia and Julie B. Waldman for Defendants and Respondents.

Eugene Volokh; David S. Welkowitz and Tyler T. Ochoa as Amici Curiae on behalf of Defendants and Respondents.

Loeb & Loeb, Douglas E. Mirell and Joseph Geisman for the Motion Picture Association of America, Inc., Association of American Publishers, Inc., Authors Guild, Inc., Publishers Marketing Association, Comic Book Legal Defense Fund, Dramatists Guild of America, Inc., PEN American Center, American Booksellers Foundation for Free Expression and Freedom to Read Foundation as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**CHIN, J.**—Celebrities have a statutory right of publicity by which they can prohibit others from using their likeness. (Civ. Code, § 3344.) An obvious tension exists between this right of publicity and the First Amendment to the United States Constitution. (*Comedy III Productions, Inc. v. Gary Saderup, Inc.* (2001) 25 Cal.4th 387, 396 [106 Cal.Rptr.2d 126, 21 P.3d 797] (*Comedy III*).) In *Comedy III*, we considered when constitutional free speech rights may trump the statutory right of publicity. We formulated "what is essentially a balancing test between the First Amendment and the right of publicity based on whether the work in question adds significant creative elements so as to be transformed into something more than a mere celebrity likeness or imitation." (*Id.* at p. 391.) In that case, we concluded that lithographs and T-shirts bearing the likeness of The Three Stooges were not sufficiently transformative to receive First Amendment protection.

In this case, we apply the same balancing test to comic books containing characters that evoke musician brothers Johnny and Edgar Winter. We conclude that, in contrast to a drawing of The Three Stooges, the comic books do contain significant creative elements that transform them into something more than mere celebrity likenesses. Accordingly, the comic books are entitled to First Amendment protection.

## I. FACTS AND PROCEDURAL HISTORY

In the 1990's, DC Comics published a five-volume comic miniseries featuring "Jonah Hex," a fictional comic book "anti-hero." The series contains an outlandish plot, involving giant worm-like creatures, singing cowboys, and the "Wilde West Ranch and Music and Culture Emporium," named for and patterned after the life of Oscar Wilde. The third volume ends with a reference to two new characters, the "Autumn brothers," and the teaser, "Next: The Autumns of Our Discontent." The cover of volume 4 depicts the Autumn brother characters, with pale faces and long white hair. (See append., *post*; the Autumn brothers are the two lower figures.) One brother wears a stovepipe hat and red sunglasses, and holds a rifle. The second has red eyes and holds a pistol. This volume is entitled Autumns of Our Discontent, and features brothers Johnny and Edgar Autumn, depicted as villainous half-worm, half-human offspring born from the rape of their mother by a supernatural worm creature that had escaped from a hole in the ground. At the end of volume 5, Jonah Hex and his companions shoot and kill the Autumn brothers in an underground gun battle.

Plaintiffs, Johnny and Edgar Winter, well-known performing and recording musicians originally from Texas, sued DC Comics and others alleging several causes of action including, as relevant here, appropriation of their names and likenesses under Civil Code section 3344. They alleged that the defendants selected the names Johnny and Edgar Autumn to signal readers the Winter brothers were being portrayed; that the Autumn brothers were drawn with long white hair and albino features similar to plaintiffs'; that the Johnny Autumn character was depicted as wearing a tall black top hat similar to the one Johnny Winter often wore; and that the title of volume 4, Autumns of Our Discontent, refers to the famous Shakespearian phrase, "the winter of our discontent."[1] They also alleged that the comics falsely portrayed them as "vile, depraved, stupid, cowardly, subhuman individuals who engage in wanton acts of violence, murder and bestiality for pleasure and who should be killed."

Defendants moved for summary judgment, partly relying on the First Amendment. The trial court granted summary judgment on all causes of action and entered judgment in defendants' favor. The Court of Appeal originally affirmed the judgment. We granted review and held the matter pending our decision in Comedy III, *supra*, 25 Cal.4th 387. Later, we remanded the matter for the Court of Appeal to reconsider its decision in

---

[1]"Now is the winter of our discontent/Made glorious summer by this sun of York." (Shakespeare, Richard III, act I, scene 1, lines 1-2.) The phrase was also popularized by the John Steinbeck novel, The Winter of Our Discontent (1961).

light of *Comedy III.* This time, the Court of Appeal affirmed the summary adjudication of all causes of action other than the one for misappropriation of likeness. On the misappropriation cause of action, the court concluded that triable issues of fact exist whether or not the comic books are entitled to protection under the test adopted in *Comedy III.* It reversed the judgment and remanded for further proceedings on that cause of action.

We granted the defendants' petition for review to decide whether the comic books are protected under the *Comedy III* transformative test.

## II. DISCUSSION

Civil Code section 3344 provides as relevant: "(a) Any person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods or services, without such person's prior consent . . . shall be liable for any damages sustained by the person or persons injured as a result thereof."

In *Comedy III, supra,* 25 Cal.4th 387, the registered owner of all rights to the former comedy act known as The Three Stooges sued an artist who, without permission, sold lithographs and T-shirts bearing a likeness of The Three Stooges reproduced from a charcoal drawing the artist had made.[2] We noted that the right of publicity threatens two purposes of the First Amendment: (1) preserving an uninhibited marketplace of ideas; and (2) furthering the individual right of self-expression. "Because celebrities take on public meaning, the appropriation of their likenesses may have important uses in uninhibited debate on public issues, particularly debates about culture and values. And because celebrities take on personal meanings to many individuals in the society, the creative appropriation of celebrity images can be an important avenue of individual expression." (*Comedy III, supra,* at p. 397.) "[T]he very importance of celebrities in society means that the right of publicity has the potential of censoring significant expression by suppressing alternative versions of celebrity images that are iconoclastic, irreverent, or otherwise attempt to redefine the celebrity's meaning. [Citations.] . . . 'The right of publicity derived from public prominence does not confer a shield to ward off caricature, parody and satire. Rather, prominence invites creative comment.' " (*Ibid.,* quoting with approval *Guglielmi v. Spelling-Goldberg*

---

[2]*Comedy III, supra,* 25 Cal.4th 387, involved the celebrities' successor in interest suing under Civil Code former section 990 (now Civ. Code, § 3344.1), rather than the celebrities themselves suing under Civil Code section 3344. (See *Comedy III, supra,* at p. 391 & fn. 1.) But, because similar First Amendment concerns exist under both provisions, the test we developed in that case applies equally to claims under Civil Code section 3344.

*Productions* (1979) 25 Cal.3d 860, 869 [160 Cal.Rptr. 352, 603 P.2d 454] (conc. opn. of Bird, C. J.).)

Accordingly, we held that some, although not all, uses of celebrity likenesses are entitled to First Amendment protection. ■ "When artistic expression takes the form of a literal depiction or imitation of a celebrity for commercial gain, directly trespassing on the right of publicity without adding significant expression beyond that trespass, the state law interest in protecting the fruits of artistic labor outweighs the expressive interests of the imitative artist." (*Comedy III, supra,* 25 Cal.4th at p. 405, fn. omitted.) Thus, "depictions of celebrities amounting to little more than the appropriation of the celebrity's economic value are not protected expression under the First Amendment." (*Id.* at p. 400.) "The right-of-publicity holder [may still] enforce the right to monopolize the production of conventional, more or less fungible, images of the celebrity." (*Id.* at p. 405.) "On the other hand, when a work contains significant transformative elements, it is not only especially worthy of First Amendment protection, but it is also less likely to interfere with the economic interest protected by the right of publicity. . . . [W]orks of parody or other distortions of the celebrity figure are not, from the celebrity fan's viewpoint, good substitutes for conventional depictions of the celebrity and therefore do not generally threaten markets for celebrity memorabilia that the right of publicity is designed to protect." (*Ibid.*)

■ We developed a test to determine whether a work merely appropriates a celebrity's economic value, and thus is not entitled to First Amendment protection, or has been transformed into a creative product that the First Amendment protects. The "inquiry is whether the celebrity likeness is one of the 'raw materials' from which an original work is synthesized, or whether the depiction or imitation of the celebrity is the very sum and substance of the work in question. We ask, in other words, whether a product containing a celebrity's likeness is so transformed that it has become primarily the defendant's own expression rather than the celebrity's likeness. And when we use the word 'expression,' we mean expression of something other than the likeness of the celebrity." (*Comedy III, supra,* 25 Cal. 4th at p. 406.) These "transformative elements or creative contributions that require First Amendment protection are not confined to parody and can take many forms, from factual reporting [citation] to fictionalized portrayal [citations], from heavyhanded lampooning [citation] to subtle social criticism [citation]." (*Ibid.*) "[A]n artist depicting a celebrity must contribute something more than a ' " 'merely trivial' " ' variation, [but must create] something recognizably " 'his own' " ' [citation], in order to qualify for legal protection." (*Id.* at p. 408.) "[W]hen an artist's skill and talent is manifestly subordinated to the overall goal of creating a conventional portrait of a celebrity so as to

commercially exploit his or her fame, then the artist's right of free expression is outweighed by the right of publicity." (*Ibid.*)

■ We made two important cautionary observations. First, "the right of publicity cannot, consistent with the First Amendment, be a right to control the celebrity's image by censoring disagreeable portrayals. Once the celebrity thrusts himself or herself forward into the limelight, the First Amendment dictates that the right to comment on, parody, lampoon, and make other expressive uses of the celebrity image must be given broad scope. The necessary implication of this observation is that the right of publicity is essentially an economic right. What the right of publicity holder possesses is not a right of censorship, but a right to prevent others from misappropriating the economic value generated by the celebrity's fame through the merchandising of the 'name, voice, signature, photograph, or likeness' of the celebrity. [Citation.]" (*Comedy III, supra,* 25 Cal.4th at p. 403.) Second, "in determining whether the work is transformative, courts are not to be concerned with the quality of the artistic contribution—vulgar forms of expression fully qualify for First Amendment protection. [Citations.] On the other hand, a literal depiction of a celebrity, even if accomplished with great skill, may still be subject to a right of publicity challenge. The inquiry is in a sense more quantitative than qualitative, asking whether the literal and imitative or the creative elements predominate in the work." (*Id.* at p. 407.)

We also cautioned against "wholesale importation of the fair use doctrine [of copyright law] into right of publicity law," although it provides some guidance. (*Comedy III, supra,* 25 Cal.4th at p. 404.) We explained that one factor of the fair use test, " 'the effect of the use upon the potential market for or value of the copyrighted work' (17 U.S.C. § 107(4)), . . . bears directly on this question. We do not believe, however, that consideration of this factor would usefully supplement the test articulated here. If it is determined that a work is worthy of First Amendment protection because added creative elements significantly transform the celebrity depiction, then independent inquiry into whether or not that work is cutting into the market for the celebrity's images . . . appears to be irrelevant." (*Id.* at p. 405, fn. 10.) ■ Moreover, we explained that even if the work's marketability and economic value derive primarily from the fame of the celebrity depicted, the work may still be transformative and entitled to First Amendment protection. However, if the marketability and economic value of the challenged work do *not* derive primarily from the celebrity's fame, "there would generally be no actionable right of publicity. When the value of the work comes principally from some source other than the fame of the celebrity—from the creativity, skill, and reputation of the artist—it may be presumed that sufficient transformative elements are present to warrant First Amendment protection." (*Id.* at p. 407.)

■ We then summarized the rule. "In sum, when an artist is faced with a right of publicity challenge to his or her work, he or she may raise as [an] affirmative defense that the work is protected by the First Amendment inasmuch as it contains significant transformative elements or that the value of the work does not derive primarily from the celebrity's fame." (*Comedy III, supra,* 25 Cal.4th at p. 407.)

In applying this test in *Comedy III* itself, we viewed the work in question and concluded that the right of publicity prevailed. We could "discern no significant transformative or creative contribution. [The artist's] undeniable skill is manifestly subordinated to the overall goal of creating literal, conventional depictions of The Three Stooges so as to exploit their fame. Indeed, were we to decide that [the artist's] depictions were protected by the First Amendment, we cannot perceive how the right of publicity would remain a viable right other than in cases of falsified celebrity endorsements. [¶] Moreover, the marketability and economic value of [the artist's] work derives primarily from the fame of the celebrities depicted. While that fact alone does not necessarily mean the work receives no First Amendment protection, we can perceive no transformative elements in [the] works that would require such protection." (*Comedy III, supra,* 25 Cal.4th at p. 409.)

■ Application of the test to this case is not difficult. We have reviewed the comic books and attach a copy of a representative page. We can readily ascertain that they are not just conventional depictions of plaintiffs but contain significant expressive content other than plaintiffs' mere likenesses. Although the fictional characters Johnny and Edgar Autumn are less-than-subtle evocations of Johnny and Edgar Winter, the books do not depict plaintiffs literally. Instead, plaintiffs are merely part of the raw materials from which the comic books were synthesized. To the extent the drawings of the Autumn brothers resemble plaintiffs at all, they are distorted for purposes of lampoon, parody, or caricature. And the Autumn brothers are but cartoon characters—half-human and half-worm—in a larger story, which is itself quite expressive. The characters and their portrayals do not greatly threaten plaintiffs' right of publicity. Plaintiffs' fans who want to purchase pictures of them would find the drawings of the Autumn brothers unsatisfactory as a substitute for conventional depictions. The comic books are similar to the trading cards caricaturing and parodying prominent baseball players that have received First Amendment protection. (*Cardtoons v. Major League Baseball Players* (10th Cir. 1996) 95 F.3d 959, discussed in *Comedy III, supra,* 25 Cal.4th at p. 406.) Like the trading cards, the comic books " 'are no less protected because they provide humorous rather than serious commentary.' " (*Comedy III, supra,* at p. 406, quoting *Cardtoons v. Major League Baseball Players, supra,* at p. 969.)

Citing *Dr. Seuss Enterprises, L.P. v. Penguin Books* (9th Cir. 1997) 109 F.3d 1394, plaintiffs argue, and the Court of Appeal agreed, that the comic books do not technically qualify as parody of plaintiffs (although the Court of Appeal found they may qualify as parody of Jonah Hex). That case, however, involved alleged copyright and trademark infringement, allegations not involved here. *Comedy III* did not adopt copyright law wholesale. (*Comedy III, supra,* 25 Cal.4th at p. 404.) The distinction between parody and other forms of literary expression is irrelevant to the *Comedy III* transformative test. It does not matter what precise literary category the work falls into. What matters is whether the work is transformative, not whether it is parody or satire or caricature or serious social commentary or any other specific form of expression.

Plaintiffs also argue, and the Court of Appeal found, that the record contains evidence that defendants were trading on plaintiffs' likenesses and reputations to generate interest in the comic book series and increase sales. This, too, is irrelevant to whether the comic books are constitutionally protected. The question is whether the work is transformative, not how it is marketed. If the work is sufficiently transformative to receive legal protection, "it is of no moment that the advertisements may have increased the profitability of the [work]." (*Guglielmi v. Spelling-Goldberg Productions, supra,* 25 Cal.3d at p. 873 (conc. opn. of Bird, C. J.).) If the challenged work is transformative, the way it is advertised cannot somehow make it nontransformative. Here, as we have explained, the comic books are transformative and entitled to First Amendment protection.[3]

Accordingly, we conclude that the Court of Appeal erred in finding the existence of triable issues of fact. ■ "[B]ecause unnecessarily protracted litigation would have a chilling effect upon the exercise of First Amendment rights, speedy resolution of cases involving free speech is desirable." (*Good Government Group of Seal Beach, Inc. v. Superior Court* (1978) 22 Cal.3d 672, 685 [150 Cal.Rptr. 258, 586 P.2d 572]; see also *Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 269 [228 Cal.Rptr. 206, 721 P.2d 87]; *Aisenson v. American Broadcasting Co.* (1990) 220 Cal.App.3d 146, 154 [269 Cal.Rptr. 379].) As in *Comedy III, supra,* 25 Cal.4th 387, courts can often resolve the question as a matter of law simply by viewing the work in question and, if necessary, comparing it to an actual

---

[3]Plaintiffs also claim that the way the comic books were advertised is itself actionable, for example, by falsely implying plaintiffs endorsed the product. (See *Comedy III, supra,* 25 Cal.4th at p. 396.) This question is beyond the scope of our grant of review and the Court of Appeal's opinion, which focused on whether the comic books are constitutionally protected. We leave it to the Court of Appeal on remand to decide whether plaintiffs have preserved a cause of action based solely on the advertising and, if so, whether that cause of action is susceptible to summary adjudication.

likeness of the person or persons portrayed. Because of these circumstances, an action presenting this issue is often properly resolved on summary judgment or, if the complaint includes the work in question, even demurrer. This is one of those cases.

## III. CONCLUSION

The artist in *Comedy III, supra*, 25 Cal.4th 387, essentially sold, and devoted fans bought, pictures of The Three Stooges, not transformed expressive works by the artist. Here, by contrast, defendants essentially sold, and the buyers purchased, DC Comics depicting fanciful, creative characters, not pictures of the Winter brothers. This makes all the difference. The comic books here are entitled to First Amendment protection.

Accordingly, we reverse the judgment of the Court of Appeal and remand the matter for further proceedings consistent with our opinion.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Brown, J., and Moreno, J., concurred.