AMBRO, Circuit Judge,
dissenting.
My colleagues and I take the same road but read the signs differently. Hence we stop at different places. I wish I was with them; I am not. I recognize that Electronic Arts, Inc. (“EA”) has taken for the 2005 version of NCAA Football what most good Rutgers fans during Ryan Hart’s playing days know—the Rutgers quarterback is Hart—and parlayed that recognition into commercial success.[1] A key to the profitability of NCAA Football is consumers’ desire to experience a realistic football playing experience with their favorite teams. EA’s use of actual college athletes’ likenesses motivates buyers to *171 purchase a new edition each year to keep up with their teams’ changing rosters. The burn to Hart and other amateur athletes is that, unlike their active professional counterparts, they are not compensated for EA’s use of their likenesses in its video games. Were this case viewed strictly on the public’s perception of fairness, I have no doubt Hart’s position would prevail.[2]
Hart claims that he has under New Jersey law a right of publicity to prevent others from unfairly appropriating the value of his likeness for their commercial benefit, and that the First Amendment does not shield EA’s infringement of this right. This claim requires us to balance the competing interests implicated by the right of publicity and the First Amendment. I agree with my colleagues that the Transformative Use Test is the preferred approach for balancing these interests, but we part ways on its interpretation and application. The result is that they side with Hart, and I with EA.
The Transformative Use Test gives First Amendment immunity where, in an expressive work, an individual’s likeness has been creatively adapted in some way. Correctly applied, this test strikes an appropriate balance between countervailing rights—the publicity interest in protecting an individual’s right to benefit financially when others use his identifiable persona for their own commercial benefit versus the First Amendment interest in insulating from liability a creator’s decision to interweave real-life figures into its expressive work.
My colleagues limit effectively their transformative inquiry to Hart’s identity alone, disregarding other features of the work. This approach, I believe, does not find support in the cases on which they rely. Further, my colleagues penalize EA for the realism and financial success of NCAA Football, a position I find difficult to reconcile with First Amendment protections traditionally afforded to true-to-life depictions of real figures and works produced for profit. Because I conclude that the Transformative Use Test protects EA’s use of Hart’s likeness in NCAA Football, I respectfully dissent.
I. Formulation of the Transformative Inquiry
To determine whether an individual’s identity has been “transformed” for purposes of the Transformative Use Test, I believe it is necessary to review the likeness in the context of the work in its entirety, rather than focusing only on the individual’s likeness. This interpretation is in line with the approach taken in Comedy III Productions, Inc. v. Gary Saderup, Inc., 25 Cal.4th 387, 106 Cal.Rptr.2d 126, 21 P.3d 797 (2001), in which the Supreme Court of California first put in play the Transformative Use Test. Per Comedy III, the right of publicity prevails over competing First Amendment interests “[w]hen artistic expression takes the form of a literal depiction or imitation of a celebrity for commercial gain.” Id., 106 Cal.Rptr.2d 126, 21 P.3d at 808 (citing Zacchini v. Scripps-Howard Broad. Co., 433 U.S. 562, 575-76, 97 S.Ct. 2849, 53 L.Ed.2d 965 *172 (1977)). To determine whether a work qualifies as “transformative” and not simply “literal,” the Comedy III Court explained that “the inquiry is whether the celebrity likeness is one of the ‘raw materials’ from which an original work is synthesized, or whether the depiction or imitation of the celebrity is the very sum and substance of the work in question.” Id., 106 Cal.Rptr.2d 126, 21 P.3d at 809 (emphases added).
Likewise, when applying the Transformative Use Test two years later in Winter v. DC Comics, 30 Cal.4th 881, 134 Cal.Rptr.2d 634, 69 P.3d 473 (2003), the California Supreme Court explained that the defendant’s use was transformative because it could “readily ascertain that [the portrayals] are not just conventional depictions of plaintiffs but contain significant expressive content other than plaintiffs’ mere likenesses.” Id., 134 Cal.Rptr.2d 634, 69 P.3d at 479 (emphasis added). The Court also observed that the characters were placed in a “larger story, which is itself quite expressive.” Id.[3] The repeated focus on the use of an individual’s likeness in the context of the work as a whole leaves me little doubt that we must examine the creative work in the aggregate to determine whether it satisfies the Trans-formative Use Test and merits First Amendment protection.
My colleagues correctly recite the Transformative Use Test set out in Comedy III and Winter [Majority Op. at 158-61], but later disregard that recitation. When addressing Hart’s claim, their analysis proceeds by analyzing, on a step-by-step basis, the digital avatar based on Hart, the context in which that avatar is set in NCAA Football, and the users’ ability to alter the avatar’s appearance, concluding at each step that Hart’s likeness is not sufficiently changed to qualify as “transformative.” In the last instance, my colleagues reject as immaterial the myriad other creative elements of the video game on the ground that “[decisions applying the Transformative Use Test invariably look to how the celebrity’s identity is used,” and that “[wjholly unrelated elements do not bear on this inquiry.” [Majority Op. at 169 (emphasis in original).] But by cabining their inquest to Hart’s likeness alone, their approach is at odds with California Supreme Court decisions on the Transformative Use Test.[4]
The infirmity of this approach is highlighted by ETW Corp. v. Jireh Publishing, Inc., 332 F.3d 915 (6th Cir.2003), in which the Sixth Circuit Court of Appeals concluded that an artist’s use of several photo *173 graphs of Tiger Woods in a commemorative collage was “transformative,” and thus shielded from Woods’ right-of-publicity suit. My colleagues do not—and, in my view, cannot—explain how the photographic images of Woods were transformed if they limit their analysis to “how the celebrity’s identity is used.” [Majority Op. at 189 (emphasis in original).] Instead, their discussion of ETW recognizes that the Sixth Circuit held that the artist’s use qualified for First Amendment protection under the Transformative Use Test because “the collage ‘contain[ed] significant transformative elements,’ ” and the combination of images “ describe[d], in artistic form, a historic event in sports history[— the 1997 Masters golf tournament—]and ... eonvey[ed] a message about the significance of Woods’ achievement in that event.’ ” [Majority Op. at 161 (first alteration in original) (emphasis added) (quoting ETW, 332 F.3d at 938; citing Comedy III, 106 Cal.Rptr.2d 126, 21 P.3d at 809).] No doubt the use at issue here—creating digital avatars of football teams and placing them in an interactive medium designed for user interaction and manipulation—is significantly more “transformative” than the use in ETW, which simply combined several photographs into a photomontage.
To me, a narrow focus on an individual’s likeness, rather than how that likeness is incorporated into and transformed by the work as a whole, is a flawed formulation of the transformative inquiry. The whole— the aggregate of many parts (including, here, many individuals)—is the better baseline for that inquiry.
II. Harmonization of the Transformative Use Test with First Amendment Precedent
Transformative use must mesh with existing constitutional protections for works of expression. The First Amendment extends protection to biographies, documentaries, docudramas, and other expressive works depicting real-life figures, whether the accounts are factual or fictional. See, e.g., Matthews v. Wozencraft, 15 F.3d 432, 439-40 (5th Cir.1994) (biographical novel); Ruffin-Steinback v. dePasse, 82 F.Supp.2d 723, 730-31 (E.D.Mich.2000) (television miniseries), aff'd, 267 F.3d 457, 461-62 (6th Cir.2001); Seale v. Gramercy Pictures, 949 F.Supp. 331, 337 (E.D.Pa.1996); Hicks v. Casablanca Records, 464 F.Supp. 426, 433 (S.D.N.Y.1978) (docudrama and novel); Guglielmi v. Spelling-Goldberg Prods., 25 Cal.3d 860, 160 Cal.Rptr. 352, 603 P.2d 454, 458-59 (1979) (docudrama).[5] “That books, newspapers, and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment.” Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 501, 72 S.Ct. 777, 96 L.Ed. 1098 (1952). Accordingly, courts have rejected as counter to free expression the claim that constitutional protection is diminished because a celebrity’s name or likeness was used to increase a product’s value and marketability. See Guglielmi, 160 Cal.Rptr. 352, 603 P.2d at 460-62 (Bird, C.J., concurring).[6]
The protection afforded by the First Amendment to those who weave celebrities *174 into their creative works and sell those works for profit applies equally to video games. See Brown v. Entm’t Merchs. Ass’n, — U.S.-, 131 S.Ct. 2729, 2733, 180 L.Ed.2d 708 (2011). Thus EA’s use of real-life likenesses as “characters” in its NCAA Football video game should be as protected as portrayals (fictional or nonfictional) of individuals in movies and books. I do not suggest that all digital portrayals of an individual are entitled to First Amendment protection. Rather, the work should be protected if that likeness, as included in the creative composition, has been transformed into something more or different than what it was before. And in any event the profit that flows from EA’s realistic depiction of Hart (and the myriad other college football players portrayed in NCAA Football) is not constitutionally significant, nor even an appropriate consideration, when applying the Transformative Use Test.[7]
My colleagues’ understanding of the Transformative Use Test underplays the creative elements of NCAA Football by equating its inclusion of realistic player likenesses to increase profits with the wrongful appropriation of Hart’s commercial value. This approach is at odds with the First Amendment protection afforded to expressive works incorporating real-life figures. That protection does not depend on whether the characters are depicted realistically or whether their inclusion increases profits. See Guglielmi, 160 Cal.Rptr. 352, 603 P.2d at 460-62 (Bird, C.J., concurring) (concluding that acceptance of this argument would chill free expression and mean “the creation of historical novels and other works inspired by actual events and people would be off limits to the fictional author”).
In sum, applying the Transformative Use Test in the manner done by my colleagues creates a medium-specific metric that provides less protection to video games than other expressive works. Because the Supreme Court’s decision in Brown forecloses just such a distinction, see 131 S.Ct. at 2740, my colleagues’ treatment of realism and profitability in their transformative use analysis puts us on a different course.
III. Application to Hart’s Claim
With this understanding of the Transformative Use Test, I conclude EA’s use of avatars resembling actual players is entitled to First Amendment protection. NCAA Football transforms Hart’s mere likeness into an avatar that, along with the rest of a digitally created college football team, users can direct and manipulate in fictional football games. With the many other creative features incorporated throughout the games, sufficient expres *175 sive transformation takes place to merit First Amendment protection.
NCAA Football involves myriad original graphics, videos, sound effects, and game scenarios. These artistic aspects permit a user to direct the play of a college football team whose players may be based on a current roster, a past roster, or an entirely imaginary roster comprised of made-up players. Users are not reenacting real games, but rather are directing the avatars in invented games and seasons. Further, the “Campus Legend” and “Dynasty Mode” features permit users to control virtual players and teams for multiple seasons, creating the means by which they can generate their own narratives. Such modes of interactive play are, I submit, imaginative transformations of the games played by real players.
As noted by the District Court, it is not only the user that contributes to the interactivity; EA has created “multiple permutations available for each virtual player image.” Hart v. Elec. Arts, Inc., 808 F.Supp.2d 757, 785 (D.N.J.2011). This furthers the game’s transformative interactivity. In fact, the majority opinion expressly approves the District Court’s analysis on this point. [Majority Op. at 167 n.40.].
By limiting their inquiry to the realistic rendering of Hart’s individual image, my colleagues misapply the Transformative Use Test. Contrary to their assertion that the other creative elements of NCAA Football are “[wjholly unrelated” [Majority Op. at 169], those elements are, in fact, related to EA’s use of Hart’s likeness. If and when a user decides to select the virtual 2005 Rutgers’ football team as a competitor in a game, and to the extent that user does not alter the characteristics of the avatar based on Hart’s likeness, the numerous creative elements of the video games discussed above are part of every fictional play a user calls. Any attempt to separate these elements from the use of Hart’s likeness disregards NCAA Football ’s many expressive features beyond an avatar having characteristics similar to Hart. His likeness is transformed by the artistry necessary to create a digitally rendered avatar within the imaginative and interactive world EA has placed that avatar.
I am thus convinced that, as used in NCAA Football, Hart’s “likeness is one of the ‘raw materials’ from which [the] original work is synthesized ... [rather than] the very sum and substance of the work in question.” Comedy III, 106 Cal.Rptr.2d 126, 21 P.3d at 809. EA bases its NCAA Football characters on countless real-life college football players, and it certainly seeks to depict their physical and biographical characteristics realistically. Yet these “are not just conventional depictions of [Hart] but contain significant expressive content other than [his] mere likeness[ ].” Winter, 134 Cal.Rptr.2d 634, 69 P.3d at 479. NCAA Football uses creative means to achieve its overall goal of realistically replicating a college football experience in which users may interact, direct, and control the players’ avatars, including the one based on Hart’s likeness. I find this use transformative.
iji ‡ % ‡
The Transformative Use Test I support would prevent commercial exploitation of an individual’s likeness where the work at issue lacks creative contribution that transforms that likeness in a meaningful way. I sympathize with the position of Hart and other similarly situated college football players, and understand why they feel it is fair to share in the significant profits produced by including their avatar likenesses into EA’s commercially success *176 ful video game franchise. I nonetheless remain convinced that the creative components of NCAA Football contain sufficient expressive transformation to merit First Amendment protection. Thus I respectfully dissent, and would affirm the District Court’s grant of summary judgment favor of EA.

. That said, most outside Rutgers do not know that quarterback #13 is Ryan Hart. They did not know that in 2005, and even today many, if not most, Rutgers fans no longer connect #13 with Hart. Fame fades so quickly we call it fleeting. Even nostalgic memories nod off. For example, name the BYU quarterback when it was college football's national champion in 1984. (Hint: it wasn't Ty Detmer.).

. See generally Taylor Branch, The Shame of College Sports, The Atlantic, Oct. 2011, at 80-110 (lambasting NCAA "amateurism” and "student-athlete” policies as “legalistic confections propagated by the universities so they can exploit the skills and fame of young athletes,” and discussing lawsuits challenging these policies); see also Alexander Wolff, When Worlds Collide, Sports Illustrated, Feb. 11, 2013, at 18; Joe Nocera, Pay Up Now, N.Y. Times Mag., Jan. 1, 2012, at 30-35 (advocating payment of college athletes to alleviate "[t]he hypocrisy that permeates big-money college sports” arising from amateurism rules).

. While the Winter decision makes several references to the physical differences between the plaintiffs and their likenesses, these statements were made with respect to the Court's conclusion that “the portrayals do not greatly threaten plaintiffs' right of publicity” insofar as they were unlikely to decrease their commercial value. 134 Cal.Rptr.2d 634, 69 P.3d at 479. Similarly, there is no real contention that NCAA Football is harming ticket sales of college football games or decreasing Hart's commercial value; if anything, it seems more likely that both have been augmented by the popularity of EA's video games.

. The majority opinion relies heavily on two lower court decisions in California considering the right of publicity in the video game context, No Doubt v. Activision Publishing, Inc., 192 Cal.App.4th 1018, 122 Cal.Rptr.3d 397 (2011), and Kirby v. Sega of America, Inc., 144 Cal.App.4th 47, 50 Cal.Rptr.3d 607 (2006). I do not consider these cases particularly instructive, as they were not decided by the architect of the Transformative Use Test, the Supreme Court of California. Thus, I do not attempt to explain or distinguish their holdings except to note that I believe No Doubt, which focused on individual depictions rather than the work in its entirety, was wrongly decided in light of the prior precedent in Comedy III and Winter.

. While my colleagues acknowledge the need for uniform First Amendment treatment of different mediums in the abstract [Majority Op. at 165], it is difficult to reconcile their actual application of the Transformative Use Test to the video game here with the above-cited cases.

. As recognized by my colleagues, then-Chief Justice Bird’s views in Guglielmi commanded the support of the majority of the California Supreme Court, and were relied on by the Comedy III Court to guide its definition of the Transformative Use Test. [Majority Op. at 164 n.31.].

. In devising the Transformative Use Test, the California Supreme Court borrowed from "the purpose and character of the use” factor relevant to a copyright fair use defense, see 17 U.S.C. § 107(1), yet it rejected "a wholesale importation of the fair use doctrine into right of publicity law,” Comedy III, 106 Cal.Rptr.2d 126, 21 P.3d at 807. Nonetheless, it appears my colleagues permit another fair use factor to creep into their transformative analysis. Namely, their focus on the marketability of NCAA Football seems colored by the factor considering "the effect of the use upon the potential market for or value of the copyrighted work," see 17 U.S.C. § 107(4), notwithstanding that this element was expressly excluded from Comedy III's articulation of the Transformative Use Test, see 106 Cal.Rptr.2d 126, 21 P.3d at 808 n. 10. Further, even if consideration of "market effect” were appropriate in a transformative analysis, I do not believe this factor would weigh in favor of finding an infringing use here because, as pointed out supra note 3, there is no contention that EA’s inclusion of Hart's likeness in NCAA Football has caused a decline in the commercial value of his identity or persona.