THOMAS, Circuit Judge,
dissenting:
Because the creative and transformative elements of Electronic Arts’ NCAA Football video game series predominate over the commercial use of the athletes’ likenesses, the First Amendment protects EA from liability. Therefore, I respectfully dissent.
I
As expressive works, video games are entitled to First Amendment protection. Brown v. Entm’t Merchs. Ass’n, — U.S. -, 181 S.Ct. 2729, 2733, 180 L.Ed.2d 708 (2011). The First Amendment affords additional protection to NCAA Football because it involves a subject of substantial public interest: collegiate football. Moore v. Univ. of Notre Dame, 968 F.Supp. 1330, 1337 (N.D.Ind.1997). Because football is a matter of public interest, the use of the images of athletes is entitled to constitutional protection, even if profits are involved. Montana v. San Jose Mercury News, Inc., 34 Cal.App.4th 790, 40 Cal.Rptr.2d 639, 643 n. 2 (1995); see also Cal. Civ.Code § 3344(d) (exempting from liability the “use of a name ... or likeness in connection with any ... public affairs, or sports broadcast or account”).
Where it is recognized, the tort of appropriation is a creature of common law or statute, depending on the jurisdiction. However, the right to compensation for the misappropriation for commercial use of one’s image or celebrity is far from absolute. In every jurisdiction, any right of publicity must be balanced against the constitutional protection afforded by the First Amendment. Courts have employed a variety of methods in balancing the rights. See, e.g., Doe v. TCI Cablevision, 110 S.W.3d 363, 374 (Mo.2003) (en banc). The California Supreme Court applies a “trans-formative use” test it formulated in Comedy III Productions, Inc. v. Gary Saderup, Inc., 25 Cal.4th 387, 106 Cal.Rptr.2d 126, 21 P.3d 797 (2001).[1]
As the majority properly notes, the transformative use defense is “a balancing test between the First Amendment and the right of publicity based on whether the work in question adds significant creative elements so as to be transformed into something more than a mere celebrity like *1285 ness or imitation.” Comedy III, 106 Cal. Rptr.2d 126, 21 P.3d at 799. The rationale for the test, as the majority notes, is that “when a work contains significant transformative elements, it is not only especially worthy of First Amendment protection, but it is also less likely to interfere with the economic interest protected by the right of publicity.” Id. 106 Cal.Rptr.2d 126, 21 P.3d at 808.
The five considerations articulated in Comedy III, and cited by the majority, are whether: (1) the celebrity likeness is one of the raw materials from which an original work is synthesized; (2) the work is primarily the defendant’s own expression if the expression is something other than the likeness of the celebrity; (3) the literal and imitative or creative elements predominate in the work; (4) the marketability and economic value of the challenged work derives primarily from the fame of the celebrity depicted; and (5) an artist’s skill and talent has been manifestly subordinated to the overall goal of creating a conventional portrait of a celebrity so as to commercially exploit the celebrity’s fame. Id. 106 Cal.Rptr.2d 126, 21 P.3d at 809-10.
Although these considerations are often distilled as analytical factors, Justice Mosk was careful in Comedy III not to label them as such. Indeed, the focus of Comedy III is a more holistic examination of whether the transformative and creative elements of a particular work predominate over commercially based literal or imitative depictions. The distinction is critical, because excessive deconstruction of Comedy III can lead to misapplication of the test. And it is at this juncture that I must respectfully part ways with my colleagues in the majority.
The majority confines its inquiry to how a single athlete’s likeness is represented in the video game, rather than examining the transformative and creative elements in the video game as a whole. In my view, this approach contradicts the holistic analysis required by the transformative use test. See Hart v. Elec. Arts, Inc., 717 F.3d 141, 170-76 (3d Cir.2013) (Ambro, J., dissenting).[2] The salient question is whether the entire work is transformative, and whether the transformative elements predominate, rather than whether an individual persona or image has been altered.
When EA’s NCAA Football video game series is examined carefully, and put in proper context, I conclude that the creative and transformative elements of the games predominate over the commercial use of the likenesses of the athletes within the games.
A
The first step in conducting a balancing is to examine the creative work at issue. At its essence, EA’s NCAA Football is a work of interactive historical fiction. Although the game changes from year to year, its most popular features predominately involve role-playing by the gamer. For example, a player can create a virtual image of himself as a potential college football player. The virtual player decides which position he would like to play, then participates in a series of “tryouts” or competes in an entire high school season to gauge his skill. Based on his performance, the virtual player is ranked and available to play at select colleges. The player chooses among the colleges, then assumes the role of a college football player. He *1286 also selects a major, the amount of time he wishes to spend on social activities, and practice — all of which may affect the virtual player’s performance. He then plays his position on the college team. In some versions of the game, in another mode, the virtual player can engage in a competition for the Heisman Trophy. In another popular mode, the gamer becomes a virtual coach. The coach scouts, recruits, and develops entirely fictional players for his team. The coach can then promote the team’s evolution over decades of seasons.
The college teams that are supplied in the game do replicate the actual college teams for that season, including virtual athletes who bear the statistical and physical dimensions of the actual college athletes. But, unlike their professional football- counterparts in the Madden NFL series, the NCAA football players in these games are not identified.
The gamers can also change their abilities, appearances, and physical characteristics at will. Keller’s impressive physical likeness can be morphed by the gamer into an overweight and slow virtual athlete, with anemic passing ability. And the gamer can create new virtual players out of whole cloth. Players can change teams. The gamer could pit Sám Keller against himself, or a stronger or weaker version of himself, on a different team. Or the gamer could play the game endlessly without ever encountering Keller’s avatar. In the simulated games, the gamer controls not only the conduct of the game, but the weather, crowd noise, mascots, and other environmental factors. Of course, one may play the game leaving the players unaltered, pitting team against team. But, in this context as well, the work is one of historic fiction. The gamer controls the teams, players, and games.
Applying the Comedy III considerations to NCAA Football in proper holistic context, the considerations favor First Amendment protection. The athletic likenesses are but one of the raw materials from which the broader game is constructed. The work, considered as a whole, is primarily one of EA’s own expression. The creative and transformative elements predominate over the commercial use of likenesses. The marketability and economic value of the game comes from the creative elements within, not from the pure commercial exploitation of a celebrity image. The game is not a conventional portrait of a celebrity, but a work consisting of many creative and transformative elements.
The video game at issue is much akin to the creations the California Supreme Court found protected in Winter v. DC Comics, 30 Cal.4th 881, 134 Cal.Rptr.2d 634, 69 P.3d 473, 476 (2003), where the two fabled guitarists Johnny and Edgar Winter were easily identifiable, but depicted as chimeras. It is also consistent with the California Court of Appeal’s decision in Kirby v. Sega of America, Inc., 144 Cal.App.4th 47, 50 Cal.Rptr.3d 607, 609-10 (2006), where a character easily identified as singer Kierin Kirby, more popularly known as Lady Miss. Kier, was transformed into a “‘fanciful, creative character’ who exists in the context of a unique and expressive video game.” Id. at 618. So, too, are the virtual players who populate the world of the NCAA Football series.
No Doubt v. Activision Publishing, Inc., 192 Cal.App.4th 1018, 122 Cal.Rptr.3d 397 (2011), is not to the contrary. The literal representations in No Doubt were not, and could not be, transformed in any way. Indeed, in No Doubt, the bandmembers *1287 posed for motion-capture photography to allow reproduction of their likenesses, id. at 402, and the Court of Appeal underscored the fact that the video game did not “permit players to alter the No Doubt avatars in any respect” and the avatars remained “at all times immutable images of the real celebrity musicians,” id. at 410. The Court of Appeal cited character immutability as a chief factor distinguishing that case from Winter and Kirby. Id. Unlike the avatars in No Doubt, the virtual players in NCAA Football are completely mutable and changeable at the whim of the gamer. The majority places great reliance on No Doubt as support for its proposition that the initial placement of realistic avatars in the game overcomes the First Amendment’s protection, but the Court of Appeal in No Doubt rejected such a cramped construction, noting that “even literal reproductions of celebrities may be ‘transformed’ into expressive works based on the context into which the celebrity image is placed.” Id. at 410 (citing Comedy III, 106 Cal.Rptr.2d 126, 21 P.3d at 797).[3]
Unlike the majority, I would not punish EA for the realism of its games and for the skill of the artists who created realistic settings for the football games. Majority op. at 1279 n. 10. That the lifelike roar of the crowd and the crunch of pads contribute to the gamer’s experience demonstrates how little of NCAA Football is driven by the particular likeness of Sam Keller, or any of the other plaintiffs, rather than by the game’s artistic elements.
In short, considering the creative elements alone in this case satisfies the trans-formative use test in favor of First Amendment protection.
B
Although one could leave the analysis with an examination of the transformative and creative aspects of the game, a true balancing requires an inquiry as to the other side of the scales: the publicity right at stake. Here, as well, the NCAA Football video game series can be distinguished from the traditional right of publicity cases, both from a quantitative and a qualitative perspective.
As a quantitative matter, NCAA Football is different from other right of publicity cases in the sheer number of virtual actors involved. Most right of publicity cases involve either one celebrity, or a finite and defined group of celebrities. Comedy III involved literal likenesses of the Three Stooges. Hilton v. Hallmark Cards, 599 F.3d 894, 909-12 (9th Cir.2009), involved the literal likeness of Paris Hilton. Winter involved the images of the rock star brother duo. Kirby involved the likeness of one singer. No Doubt focused on the likenesses of the members of a specific legendary band.
In contrast, NCAA Football includes not just Sam Keller, but thousands of virtual actors. This consideration is of particular significance when we examine, as instructed by Comedy III, whether the source of the product marketability comes from creative elements or from pure exploitation of a celebrity image. 106 Cal.Rptr.2d 126, 21 P.3d at 810. There is not, at this stage of the litigation^ any evidence as to the personal marketing power of Sam Keller, as distinguished from the appeal of the creative aspects of the product. Regardless, the sheer number of athletes involved *1288 inevitably diminish the significance of the publicity right at issue. Comedy III involved literal depictions of the Three Stooges on lithographs and T-shirts. Winter involved characters depicted in a comic strip. Kirby and No Doubt involved pivotal characters in a video game. The commercial image of the celebrities in each case was central to the production, and its contact with the consumer was immediate and unavoidable. In contrast, one could play NCAA Football thousands of times without ever encountering a particular avatar. In context of the collective, an individual’s publicity right is relatively insignificant. Put another way, if an anonymous virtual player is tackled in an imaginary video game and no one notices, is there any right of publicity infringed at all?
The sheer quantity of the virtual players in the game underscores the inappropriateness of analyzing the right of publicity through the lens of one likeness only. Only when the creative work is considered in complete context can a proper analysis be conducted.
As a qualitative matter, the essence of NCAA Football is founded on publicly available data, which is not protected by any individual publicity rights. It is true that EA solicits and receives information directly from colleges and universities. But the information is hardly proprietary. Personal vital statistics for players are found in college programs and media guides. Likewise, playing statistics are easily available. In this respect, the information used by EA is indistinguishable from the information used in fantasy athletic leagues, for which the First Amendment provides protection, C.B.C. Distribution & Mktg., Inc. v. Major League Baseball Advanced Media, L.P., 505 F.3d 818, 823-24 (8th Cir.2007), or much beloved statistical board games, such as Strat-O-Matic. An athlete’s right of publicity simply does not encompass publicly available statistical data. See, e.g., IMS Health Inc. v. Sorrell, 630 F.3d 263, 271-72 (2d Cir.2010) (“The First Amendment protects ‘[e]ven dry information, devoid of advocacy, political relevance, or artistic expression.’ ” (quoting Universal City Studios, Inc. v. Corley, 273 F.3d 429, 446 (2d Cir.2001)) (alteration in original)).[4]
Further, the structure of the game is not founded on exploitation of an individual’s publicity rights. The players are unidentified and anonymous. It is true that third-party software is available to quickly identify the players, but that is not part of the EA package. And the fact that the players can be identified by the knowledgeable user by their position, team, and statistics is somewhat beside the point. The issue is whether the marketability of the product is driven by an individual celebrity, or by the game itself. Comedy III, 106 Cal.Rptr.2d 126, 21 P.3d at 810. Player anonymity, while certainly not a complete defense, bears on the question of how we balance the right of publicity against the First Amendment. This feature of the game places it in stark contrast with No Doubt, where the whole point of the enterprise was the successful commercial exploitation of the specifically identified, world-famous musicians.
*1289 Finally, as a qualitative matter, the publicity rights of college athletes are remarkably restricted. This consideration is critical because the “right to exploit commercially one’s celebrity is primarily an economic right.” Gionfriddo v. Major League Baseball, 94 Cal.App.4th 400, 114 Cal.Rptr.2d 307, 318 (2001). NCAA rules prohibit athletes from benefitting economically from any success on the field. NCAA Bylaw 12.5 specifically prohibits commercial licensing of an NCAA athlete’s name or picture. NCAA, 2012-13 NCAA Division I Manual § 12.5.2.1 (2012). Before being allowed to compete each year, all Division I NCAA athletes must sign a contract stating that they understand the prohibition on licensing and affirming that they have not violated any amateurism rules. In short, even if an athlete wished to license his image to EA, the athlete could not do so without destroying amateur status. Thus, an individual college athlete’s right of publicity is extraordinarily circumscribed and, in practical reality, nonexistent.[5]
In sum, even apart from consideration of transformative elements, examination of the right of publicity in question also resolves the balance in favor of the First Amendment. The quantity of players involved dilutes the commercial impact of any particular player and the scope of the publicity right is significantly reduced by the fact that: (1) a player cannot own the individual, publicly available statistics on which the game is based; (2) the players are not identified in the game; and (3) NCAA college athletes do not have the right to license their names and likenesses, even if they chose to do so.[6]
II
Given the proper application of the transformative use test, Keller is unlikely to prevail. The balance of interests falls squarely on the side of the First Amend *1290 ment. The stakes are not small. The logical consequence of the majority view is that all realistic depictions of actual persons, no matter how incidental, are protected by a state law right of publicity regardless of the creative context. This logic jeopardizes the creative use of historic figures in motion pictures, books, and sound recordings. Absent the use of actual footage, the motion picture Forrest Gump might as well be just a box of chocolates. Without its historical characters, Midnight in Paris would be reduced to a pedestrian domestic squabble. The majority’s holding that creative use of realistic images and personas does not satisfy the transformative use test cannot be reconciled with the many cases affording such works First Amendment protection.[7] I respectfully disagree with this potentially dangerous and out-of-context interpretation of the transformative use test.
For these reasons, I respectfully dissent.

. I agree with the majority that the test articulated in Rogers v. Grimaldi, 875 F.2d 994 (2d Cir.1989), should not be employed in this context. The Rogers test is appropriately applied in Lanham Act cases, where the primary concern is with the danger of consumer confusion when a work is depicted as something it is not. 15 U.S.C. § 1125(a)(1). However, the right of publicity is an economic right to use the value of one own’s celebrity. Zacchini v. Scripps-Howard Broad. Co., 433 U.S. 562, 576-77, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977). Therefore, a more nuanced balancing is required. In our context, I believe the transformative use test — if correctly applied to the work as a whole — provides the proper analytical framework.

. I agree fully with Judge Ambro's excellent dissent in Hart, which describes the analytic flaws of applying a transformative use test outside the context of the work as a whole.

. Of course, to the extent that the Court of Appeal's opinion in No Doubt may be read to be.in tension with the transformative use test as articulated by the California Supreme Court in Comedy HI and Winter, it must yield.

. Contrary to the majority’s suggestion, I do not claim that any use of a likeness founded on publicly available information is transformative. Majority op. 1283-84 n. 12. The majority's analogy to a commercial featuring Tom Brady is inapposite for at least two reasons: (1) a commercial is not interactive in the same way that NCAA Football is, and (2) Brady’s marketing power is well established, while that of the plaintiffs is not.

. The issue of whether this structure is fair to the student athlete is beyond the scope of this appeal, but forms a significant backdrop to the discussion. The NCAA received revenues of $871.6 million in fiscal year 2011-12, with 81% of the money coming from television and marketing fees. However, few college athletes will ever receive any professional compensation. The NCAA reports that in 2011, there were 67,887 college football players. Of those, 15,086 were senior players, and only 255 athletes were drafted ,for a professional team. Thus, only 1.7% of seniors received any subsequent professional economic compensation for their athletic endeavors. NCAA, Estimated Probability of Competing in Athletics Beyond the High School Interscholastic Level (2011), available at http://www.ncaa. org/wps/wcm/connect/public/ncaa/pdfs/2011/ 2011+ probability + of + going+pro.
And participation in college football can come at a terrible cost. The NCAA reports that, during a recent five-year period, college football players suffered 41,000 injuries, including 23 non-fatal catastrophic injuries and 11 fatalities from indirect catastrophic injuries. NCAA, Football Injuries: Data From the 2004/05 to 2008/09 Seasons, available at http:// www.ncaa.org/wps/wcm/connect/public/ncaa/ health + and + safety/sports + injuries/ resources/football + injuries.

. While acknowledging that these considerations are relevant to the Comedy III analysis, the majority says EA's use of realistic likenesses demonstrates that it sees "value in having- an avatar designed to mimic each individual player.” Majority op. at 1276 n. 7. But the same is true of any right of publicity case. The defendants in Winter saw value in using comic book characters that resembled the Winter brothers. Andy Warhol — whose portraits were discussed in Comedy III — saw value in using images of celebrities such as Marilyn Monroe. In those cases, the products' marketability derives primarily from the creative elements, not from a pure commercial exploitation of a celebrity image. The same is ■true of NCAA Football.

. See, e.g., ETW Corp. v. Jireh Publ’g, Inc., 332 F.3d 915 (6th Cir.2003) (affording First Amendment protection to an artist's use of photographs of Tiger Woods); J. Thomas McCarthy, The Rights of Publicity and Privacy § 8.65 (2013 ed.) (collecting cases); Hart, 717 F.3d at 173 (Ambro, J., dissenting) (describing cases). Football.