Filed 2/9/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF
CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| PIERRE DANIEL,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>MARLON WAYANS,<br><br>    Defendant and Respondent. | B261814<br>Consolidated with B263950<br><br>(Los Angeles County<br>Super. Ct. No. BC555610) |

APPEAL from a judgment and an order of the Superior
Court of Los Angeles County, Rafael A. Ongkeko, Judge.
Affirmed.

Reisner & King, Adam J. Reisner, Tessa M. King;
Benedon & Serlin, Melinda W. Ebelhar and Douglas G.
Benedon for Plaintiff and Appellant.

Venable, William J. Briggs II, Celeste M. Brecht and
Eric J. Bakewell for Defendant and Respondent.

On September 4, 2013, Pierre Daniel (Daniel), an actor, worked as an extra in a movie entitled, A Haunted House 2 (Open Road Films 2014).  Marlon Wayans (Wayans) co-wrote, produced, and starred in the movie.  In August 2014, Daniel sued Wayans and others, alleging, inter alia, that he was the victim of racial harassment because during his one day of work on the movie he was compared to a Black cartoon character and called " '[n]igga.' "  In response, Wayans, pursuant to Code of Civil Procedure[1] section 425.16, moved to strike Daniel's claims against him as a SLAPP suit (strategic lawsuit against public participation), arguing that all of Daniel's claims arose from Wayans's constitutional right of free speech because the core injury-producing conduct arose out of the creation of the movie and its promotion over the Internet.  The trial court agreed with Wayans and also found that Daniel had failed to establish the probability that he would prevail on any of his claims against Wayans.  As a result, the trial court entered judgment in favor of Wayans and awarded him his attorney fees.

On appeal, Daniel argues that the trial court erred with regard to its determination of the threshold issue in Wayans's anti-SLAPP motion—that is, the conduct at issue was not part of the " 'creative process' " inherent in making the movie because it occurred when the cameras were not

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

rolling and, as a result, did not involve the right of free speech or an issue of public interest. In the alternative, Daniel contends that even if the conduct at issue implicated Wayans's right to free speech, he presented sufficient evidence to the trial court to establish a probability of prevailing. We find both of Daniel's arguments to be unpersuasive. Accordingly, we affirm the judgment.

## BACKGROUND

### I. Daniel's complaint

On August 25, 2014, in an unverified complaint, Daniel alleged that defendants EFS Entertainment, ICM Partners, and IM Global employed him as an actor for A Haunted House 2. He further alleged that Wayans was a manager, officer, shareholder, director, supervisor, managing agent, owner, principal, or employee of all of the other defendants.

The complaint asserted a total of 13 different causes of action, eight of which were asserted against Wayans: a race-based harassment claim brought pursuant to Government Code section 12940 et seq.; a claim alleging a violation of the Unruh Civil Rights Act (Civ. Code, § 51 et seq.); a claim brought pursuant to Civil Code section 3344 for the unauthorized use of another's photograph for advertising; a common law misappropriation of likeness claim; a common law "false light"/invasion of privacy claim; a common law claim for breach of a quasi-contract; a common law claim for unjust enrichment; and a common law claim for intentional infliction of emotional distress.

Daniel's claims against Wayans stem from two different but related contexts of alleged misconduct. The first alleged misconduct occurred solely on the movie set (the on-set comments and conduct). Specifically, Daniel alleged that Wayans subjected him to "offensive and derogatory language regarding his race/national origin," such as repeatedly referring to him "in a demeaning manner, as 'Nigga,' a derogatory term and racial slur used to refer to African-Americans"; "repeatedly mocking [Daniel]'s 'afro' "; "repeatedly and negatively referr[ing] to [Daniel] as 'Cleveland Brown,' an African American cartoon character in the adult cartoon comedy series 'Family Guy' "; routinely leering, staring, and rolling his eyes at Daniel; ridiculing Daniel in the presence of other crew members; and treating Daniel "differently, disparately, and negatively because of his race/national origin, including making demeaning, abusive, and derogatory comments and gestures."

The second arena or context of alleged misconduct evolved primarily on the Internet (the Internet posting). Specifically, Daniel alleged that Wayans took Daniel's photograph without his consent and then posted it on the Internet and "Defendants' websites alongside a photograph of [a] popular African-American cartoon character, 'Cleveland Brown' with the inappropriate caption, 'Tell me this nigga don't look like . . . THIS NIGGA!!! Ol cleveland Brown ass lookin @ahhmovie 2 @whatthefunny I'm hurtin!' "

## II.    Wayans's anti-SLAPP motion

On November 5, 2014, Wayans filed a special motion to strike pursuant to section 425.16.  Wayans's anti-SLAPP motion challenged all causes of action in which he was named.  Wayans argued that he met his burden under the anti-SLAPP statute because his creative spark in referring to Daniel as "Cleveland" resulted in the birth of a character in the film; his use of the word nigga, a term liberally used throughout the film, helped advance or assist in the creation of dialogue for the film; and by promoting Daniel in the Internet and Twitter post as a Cleveland Brown look-alike, Wayans helped promote the film.  The motion was supported by three declarations:  one by Wayans himself; one by the movie's leading actress, Jaime Pressly (Pressly); and one by Rick Alvarez (Alvarez), "a producer and cowriter" of both A Haunted House and A Haunted House 2.

### A.    WAYANS'S DECLARATION

In his declaration, Wayans admitted joking with Daniel about his resemblance to the Cleveland Brown cartoon character.  Wayans stated he then named the character portrayed by Daniel "Cleveland" and used that name as he improvised dialogue for the scene in which Daniel appeared.  Wayans emphasized that on-set improvisation, including "[j]oking around," constituted a key part of the creative process both in A Haunted House 2 and in his other movies, as the scripts for those movies were often just an "outline of scenes."  To demonstrate the improvisational nature of the movie's creative process,

Wayans submitted the certified transcript of three different "takes" of the scene in which Daniel appeared; in each of those takes the action is the same—Wayans's character calling Daniel's character to help get a heavy safe off of his dog—but the dialogue is markedly different each time as Wayans experiments or improvises.

Wayans also admitted taking Daniel's photograph, but declared that Daniel consented and posed for the photograph. Wayans then "juxtaposed the photo with a humorously similar photo of Mr. Daniel's cartoon look-alike, Cleveland Brown, with the caption" alleged in the complaint and previously quoted herein. Wayans continued: "My reference to '@ahhmovie2' was a link to the Twitter and Instagram pages for A Haunted House 2. My reference to 'whatthefunny' is a reference to my website, which posts humorous videos. I then posted the juxtaposed photos and caption to my Twitter account, which at that time had over a million followers." (Italics omitted.) Wayans stated that Daniel at no time objected or stated he was uncomfortable when Wayans joked with him, took the photo, or posted it.

B. PRESSLY'S DECLARATION

In her declaration, Pressly stated that she observed Wayans and Daniel interacting on the set and declared that Daniel laughed at Wayans's joke that Daniel looked like the Cleveland Brown cartoon character and noted that Wayans was so struck by the resemblance that he decided to use Cleveland as the name for Daniel's character. Pressly further declared that Daniel not only agreed to be

photographed by Wayans but posed for the photograph and later joined in the laughter among the cast and crew on the set once the photograph and the image of the Cleveland Brown character were posted to the Internet.

With regard to the creative process for the movie, Pressly affirmed that "[m]any of the scenes in A Haunted House 2 were improvisational in nature," meaning that "the actors and actresses spontaneously make up jokes as they go along." On a related note, Pressly stated that much of the comedy in the movie derived from making fun of various stereotypes, including racial stereotypes. As a result, the word nigga was used "dozens of times of times throughout the movie"; in fact, at one point in the movie Wayans's character calls Pressly's character nigga, even though Pressly is Caucasian. In addition, Pressly noted that Wayans has called her " 'nigga' in the past, and frequently uses it as a term of endearment with his friends and family."

C.    ALVAREZ'S DECLARATION

One of Alvarez's roles with regard to A Haunted House 2 was to "oversee the entire production of the film." Alvarez affirmed that Daniel was hired as a non-speaking extra for the movie and attached to his declaration a copy of a standard union voucher signed by Daniel in connection with his work on the movie (the voucher). The voucher, in part, states that Daniel agreed to give the movie's production company broad rights with regard to the use of his image: "I hereby grant to the Production Company of The Production, its successors, assignees, licenses or any other person or

company who might gain title or rights to the production, the right to photograph me and record my voice to use, alter, dub, edit, and or otherwise change such photographs and recordings, in any manner whatsoever and for any reason in connection with The Production, such right to be worldwide and in perpetuity."

As with Wayans and Pressly, Alvarez described the creative process for the movie as improvisational:  "A Haunted House 2 is an R-Rated comedy.  To make the film as funny as possible, much of the dialogue was intended to be, and was, developed on the set through improvisation.  The actors were encouraged to improvise, ad lib, and have fun as part of the creative process.  Mr. Wayans and the other actors regularly joked amongst themselves and with others on the set to develop dialogue and create an atmosphere that was humorous and conducive to comedy."  (Italics omitted.)

Alvarez, like Pressly, noted that the word nigga, and variants such as nigger and niggie, are used "dozens of times, throughout the movie as part of the comedy."  Alvarez goes on to note that the movie "includes a scene that specifically explores the idea that the use of the terms 'nigga' and 'nigger' are sometimes considered socially acceptable for black people to use but not people with other racial backgrounds."  Like Pressly, Alvarez affirmed that Wayans uses the term nigga as a term of endearment, noting that Wayans "has even called [him] 'nigga' during the time [they] spent writing together, and [he is] not black."

## III. Daniel's opposition

Daniel opposed Wayans's motion, arguing, inter alia, that the anti-SLAPP statute does not reach claims for racial harassment and that there was no "public interest" in the photo of him and the Cleveland Brown character that Wayans posted to the Internet. In addition, he argued that there was sufficient evidence to show a probability of prevailing on each of his claims.

In support of his opposition Daniel submitted a declaration of his own in which he, inter alia, elaborated upon Wayans's alleged harassment of him on the set. Daniel stated that Wayans first called him Cleveland while he was "waiting off camera to receive [his] acting directions," when filming was not underway. Wayans also said, " 'O'l Cleveland Brown with your afro and thick mustache, you need to shed some pounds.' " Wayans then called Daniel a " 'black fat ass' and began laughing at" him. Daniel declared that throughout the day, while he was on break and cameras were not rolling, Wayans repeatedly approached him and called him Cleveland at least 15 more times, looked and pointed at him while saying nigga at least three to four times, called Daniel's hair an " 'Afro' " while laughing on at least 10 occasions, called Daniel a " 'black fat ass' in the presence of others at least twice, and "continuously" approached Daniel and leered, "sneeringly smile[d]," rolled his eyes, and watched Daniel. Daniel stated that at no time did he laugh when Wayans called him Cleveland and that he found Wayans's use of nigga when directed at him to be

"racially offensive and derogatory." However, Daniel did not assert that Wayans's conduct and/or comments on the set adversely affected his work in any way on the movie.

As for the photograph of him that was posted to the Internet, Daniel disputed that he gave his consent and/or laughed about the posting while on the set. According to Daniel, he did not learn of the posting until later that night after he left the set when his brother informed him of the post. When he finally did view the post, Daniel felt "extremely offended." Because other people besides his brother have called him and approached him to ask if he is "the 'Cleveland Brown' character" from the post, Daniel has suffered apprehension when going out in public, nightmares, anxiety, depression, and stress headaches as a result of Wayans's alleged misconduct.

In his declaration, Daniel did not dispute the improvisational nature of the movie's creative process, as described by Wayans, Pressly and Alvarez. Nor did he dispute that the signature on the voucher is his. Instead, he objected to the voucher on various evidentiary grounds, including lack of foundation. Daniel did not submit any declarations by any experts or any other members of the cast or crew of A Haunted House 2.

## IV. The trial court's findings

On December 11, 2014, the trial court heard oral argument on the motion. On December 31, 2014, the trial court issued a 17-page ruling, which, inter alia, overruled Daniel's objection to the voucher and granted Wayans's

10

motion in its entirety. On January 23, 2015, the trial court entered a judgment in favor of Wayans. On March 13, 2015, the trial court, in accord with the anti-SLAPP statute (§ 425.16, subd. (c)), awarded attorney fees to Wayans in the amount of $96,040. Daniel filed a timely appeal with regard to both the judgment and the award of attorney fees.

## DISCUSSION

### I. Standard of review

We review an order granting or denying an anti-SLAPP motion de novo. (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820.) We consider the "pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2).) We do not "weigh evidence or resolve conflicting factual claims. [Our] inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment. [We] accept[ ] the plaintiff's evidence as true, and evaluate[ ] the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384–385.)

### II. Anti-SLAPP principles

"A SLAPP suit—a strategic lawsuit against public participation—seeks to chill or punish a party's exercise of constitutional rights to free speech and to petition the government for redress of grievances. [Citation.] The Legislature enacted . . . section 425.16—known as the anti-SLAPP statute—to provide a procedural remedy to dispose of

11

lawsuits that are brought to chill the valid exercise of constitutional rights." (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1055–1056.)

To determine whether a lawsuit or cause of action should be disposed of as a SLAPP suit, section 425.16 establishes a two-part test. "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. (§ 425.16, subd. (b)(1).) 'A defendant meets this burden by demonstrating that the act underlying the plaintiff's cause [of action] fits one of the categories spelled out in section 425.16, subdivision (e).' " (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88.) A cause of action arises from protected activity if "the defendant's acts underpinning the plaintiff's cause of action involve[s] an exercise of the right of petition or free speech." (*Gerbosi v. Gaims, Weil, West & Epstein, LLP* (2011) 193 Cal.App.4th 435, 443.)

If the defendant makes this showing, the court proceeds to the second step of the anti-SLAPP analysis. (*Navellier v. Sletten, supra*, 29 Cal.4th at p. 88.) In the second step, the court decides whether the plaintiff has demonstrated a reasonable probability of prevailing at trial on the merits of its challenged causes of action. (*Ibid*.) Conversely, if the defendant does not meet its burden on the first step, the court should deny the motion and need not address the second step. "Only a cause of action that satisfies both prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning and lacks even

12

minimal merit—is a SLAPP, subject to being stricken under the statute." (*Id*. at p. 89, italics omitted.)

## III. Step one: Wayans met his burden

Under the two-step process applicable to anti-SLAPP motions, we must first determine whether Wayans made a threshold showing that Daniel's claims arise from a protected activity.

### A. WAYANS'S BURDEN

In assessing whether a cause of action arises from protected activity, " 'we disregard the labeling of the claim [citation] and instead "examine the *principal thrust* or *gravamen* of a plaintiff's cause of action . . . ." . . . [Citation.] We assess the principal thrust by identifying "[t]he allegedly wrongful and injury-producing conduct . . . that provides the foundation for the claim." [Citation.] If the core injury-producing conduct upon which the plaintiff's claim is premised does not rest on protected speech or petitioning activity, collateral or incidental allusions to protected activity will not trigger application of the anti-SLAPP statute.' " (*Tuszynska v. Cunningham* (2011) 199 Cal.App.4th 257, 267.) "[T]he critical point is whether the plaintiff's cause of action itself was *based on* an act in furtherance of the defendant's right of petition or free speech." (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78.) "In other words, 'the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech.' "

13

(*Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 670.)

When evaluating whether the defendant has carried its burden under the first prong of the anti-SLAPP statute, "courts must be careful to distinguish allegations of conduct on which liability is to be based from allegations of motives for such conduct. '[C]auses of action do not arise from motives; they arise from acts.' " (*People ex rel. Fire Ins. Exchange v. Anapol* (2012) 211 Cal.App.4th 809, 823.) " 'The court reviews the parties' pleadings, declarations and other supporting documents to determine what conduct is actually being challenged, not to determine whether the conduct is actionable.' " (*Id.* at p. 822.)

A defendant need only make a prima facie showing that the plaintiff's claims arise from protected activity. (*Mundy v. Lenc* (2012) 203 Cal.App.4th 1401, 1408; *People ex rel. Fire Ins. Exchange v. Anapol*, *supra*, 211 Cal.App.4th at p. 822.) "The Legislature did not intend that in order to invoke the special motion to strike the defendant must first establish her actions are constitutionally protected under the First Amendment as a matter of law." (*Fox Searchlight Pictures, Inc. v. Paladino* (2001) 89 Cal.App.4th 294, 305.) "Instead, under the statutory scheme, *a court must generally presume the validity of the claimed constitutional right in the first step of the anti-SLAPP analysis*, and then permit the parties to address the issue in the second step of the analysis, if necessary. [Citation.] Otherwise, the second step would become superfluous in almost every case,

14

resulting in an improper shifting of the burdens." (*Chavez v. Mendoza* (2001) 94 Cal.App.4th 1083, 1089, italics added; *City of Los Angeles v. Animal Defense League* (2006) 135 Cal.App.4th 606, 621.)

Daniel argues that Wayans's conduct necessarily falls outside the protections of the anti-SLAPP statute because the gravamen of his complaint is race-based harassment and such conduct is not a protected activity. We are unpersuaded by Daniel's argument because the exercise of free speech here was central, not incidental, to his alleged injuries. (See *Nam v. Regents of University of California* (2016) 1 Cal.App.5th 1176, 1190 (*Nam*) ["protected activity that is incidental to a cause of action [does not] justify an anti-SLAPP dismissal"]; see also *Hunter v. CBS Broadcasting, Inc.* (2013) 221 Cal.App.4th 1510, 1521, 1525.)

The distinction between communicative conduct that is central versus that which is incidental to the exercise of the right to petition or the right of free speech is illustrated by the two cases upon which Daniel relies: *Department of Fair Employment & Housing v. 1105 Alta Loma Road Apartments, LLC* (2007) 154 Cal.App.4th 1273 (*DFEH*); *Martin v. Inland Empire Utilities Agency* (2011) 198 Cal.App.4th 611 (*Martin*). In both *DFEH* and *Martin*, the alleged injury-producing conduct were acts of discrimination largely, if not completely, untethered to the exercise of the defendant's free speech/petitioning rights.

In *DFEH*, *supra*, 154 Cal.App.4th 1273, the trial court denied the defendant's anti-SLAPP motion and the Court of

Appeal affirmed because, although the complaint discussed in detail a number of communications, those communications were not the source of the alleged injury. Rather, "the allegations of wrongdoing in DFEH's complaint arose from [the landlord]'s alleged acts of failing to accommodate [the tenant]'s disability." (*Id.* at p. 1284.)

In *Martin*, *supra*, 198 Cal.App.4th 611, the court found the employee's claims for discrimination and retaliation against his former employer were not based on protected activity, because although the complaint contained some references to protected activity—namely, poor performance reviews and a discussion of plaintiff's performance during a board meeting—those references were "mentioned only minimally in plaintiff's pleading." (*Id.* at p. 625.) Instead, the focus of plaintiff's claims was the harassing and retaliatory acts by plaintiff's supervisor (e.g., "he hired plaintiff's employees without his input, restructured plaintiff's division, and announced the latter decision in a manner allegedly meant to disgrace him"), none of which were based on the rights of petition or free speech. (*Id.* at p. 624.)

Similarly, in the more recent decision in *Nam*, *supra*, 1 Cal.App.5th 1176, the core conduct at issue did not implicate defendant's petition or free speech rights. In *Nam*, while there was some allegedly protected activity (the defendant's disciplinary process and related communications), the gravamen of plaintiff's complaint focused on defendant's acts of "retaliation for her public challenge of department policies

16

and her rejection of [a supervisor's] inappropriate overtures." (*Id.* at p. 1192.) Accordingly, the Court of Appeal affirmed the denial of defendant's anti-SLAPP motion because "the basis of [plaintiff's] claim, as in [*DFEH, supra,* 154 Cal.App.4th 1273] and *Martin*[, *supra,* 198 Cal.App.4th 611] was defendant's retaliation," not defendant's exercise of its petition or free speech rights. (*Nam*, at p. 1193.)

Here, in contrast (and as discussed in more detail below), the gravamen of Daniel's complaint stems not from any conduct incidental to Wayans's free speech rights; rather, all of the alleged misconduct is based squarely on Wayans's exercise of free speech—the creation and promotion of a full-length motion picture, including the off-camera creative process. As such, Daniel's complaint is subject to an anti-SLAPP motion.

B.    THE ACTS AT ISSUE AROSE OUT OF PROTECTED ACTIVITY

Section 425.16, subdivision (e) sets forth four categories of protected activity. Wayans contends that the conduct underlying Daniel's claims falls within section 425.16, subdivisions (e)(3) and (4), which define protected activity to include the following: " '(3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public

17

issue or an issue of public interest.' " As discussed below, we agree with Wayans.

As noted above, the acts at issue fall into two basic categories: the on-set comments and conduct; and the Internet posting. We discuss each in turn.

1. *The on-set conduct and comments*

The allegedly harassing and offensive conduct and comments by Wayans on the set of A Haunted House 2 were made in furtherance of his constitutional right of free speech in connection with an issue of public interest. (§ 425.16, subd. (e)(4).)

a. Free speech

Movies and films generally are considered "expressive works" subject to First Amendment protections. (*Guglielmi v. Spelling–Goldberg Productions* (1979) 25 Cal.3d 860, 872.) Movies are a "significant medium for the communication of ideas. They may affect public attitudes and behavior in a variety of ways, ranging from direct espousal of a political or social doctrine to the subtle shaping of thought which characterizes all artistic expression. The importance of motion pictures as an organ of public opinion is not lessened by the fact that they are designed to entertain as well as to inform." (*Joseph Burstyn, Inc. v. Wilson* (1952) 343 U.S. 495, 501, fn. omitted.) Whether exhibited in theaters or on television, a film is a medium which is protected by the constitutional guarantees of free expression. (U.S. Const., 1st & 14th Amends.; Cal. Const., art. I, § 2; *Joseph Burstyn, Inc.*, at pp. 501–502; *Red Lion Broadcasting Co. v. FCC*

18

(1969) 395 U.S. 367, 386–390.) Nor do films and movies lose their constitutional protection because they are undertaken to generate a profit. (*Guglielmi v. Spelling–Goldberg Productions*, at pp. 867–868.) In short, "it is beyond dispute that movies involve free speech." (*Dyer v. Childress* (2007) 147 Cal.App.4th 1273, 1280.) Because a film is an expressive work, its creation is also an exercise of free speech. (See *Tamkin v. CBS Broadcasting, Inc.* (2011) 193 Cal.App.4th 133, 143 [creating, casting and broadcasting T.V. episode is exercise of free speech].)

Although it is undisputed that the conduct and comments at issue were made on the set of A Haunted House 2, Daniel argues that they were not made in furtherance of Wayans's free speech rights because they occurred "during breaks, while no cameras were rolling." Daniel's argument is unavailing for several reasons.

First, Daniel's argument that the movie's creative process occurred only when the cameras were rolling rests on an unreasonably narrow or constrained view of the creative process generally. "As stated in a different context, '[t]he creative process [for a raunchy comedy] must be unfettered, especially because it can often take strange turns, as many bizarre and potentially offensive ideas are suggested, tried, and, in the end, either discarded or used . . . . [¶] . . . We must not permit juries to dissect the creative process in order to determine what was *necessary* to achieve the final product and what was not, and to impose liability . . . for that portion deemed unnecessary. Creativity

19

is, by its nature, creative.  It is unpredictable.  Much that is not obvious can be necessary to the creative process.' " (*Tamkin v. CBS Broadcasting, Inc.*, *supra*, 193 Cal.App.4th at pp. 144–145, quoting *Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 298 (conc. opn. of Chin, J.) [addressing workplace sexual harassment claim];[2]

---

[2] *Lyle*, *supra*, 38 Cal.4th 264 itself is not directly applicable to this case either procedurally (it involved a motion for summary judgment, not a special motion to strike) or substantively (it concerned alleged sexual harassment, not racial harassment, which occurred over the course of four months, not during the course of a single day). Nonetheless, the majority opinion, as well as the concurring opinion of Justice Chin, provides a number of illuminating insights about the creative process for developing a somewhat raunchy comedy.  *Lyle* involved a claim by a female employee of a television production company that the use of sexual language in the workplace by the male writers of the television show *Friends* gave rise to a hostile work environment.  (*Id.* at p. 271.)  The Supreme Court "granted review to address whether the use of sexually coarse and vulgar language in the workplace can constitute harassment based on sex within the meaning of the [Fair Employment and Housing Act] . . . ."  (*Id.* at p. 272.)  It concluded:  "Based on the totality of the undisputed circumstances, particularly the fact that the *Friends* production was a creative workplace focused on generating scripts for an adult-oriented comedy show featuring sexual themes, we find no reasonable trier of fact could conclude such language constituted harassment directed at plaintiff because of her sex within the meaning of the FEHA."  (*Ibid*.)  The *Lyle*

*Brodeur v. Atlas Entertainment, Inc.* (2016) 248 Cal.App.4th 665, 677 [declining " ' "to dissect the creative process" ' " and affirming granting anti-SLAPP].)

Second, Daniel's argument about the boundaries of the creative process for A Haunted House 2—it only occurs on-set when the camera is rolling—is flatly contradicted by the undisputed testimony offered by Wayans, Pressly and Alvarez, who affirmed that the creative process for A Haunted House 2 was highly improvisational in nature and

---

majority went on to state: "That the writers commonly engaged in discussions of personal sexual experiences and preferences and used physical gesturing while brainstorming and generating script ideas for this particular show was neither surprising nor unreasonable from a creative standpoint." (*Id.* at p. 287.)

Based on the testimony of Wayans, Pressly and Alvarez about the improvisational creative process used for the making of A Haunted House 2—an adult-oriented, R-rated feature-length comedy featuring race-based humor—it is not surprising or unreasonable that terms such as nigga, nigger and niggie, which were used dozens of times in the final version of the movie, were also used by the cast and writers as they brainstormed ideas for the script while on-set but in-between the filming of scenes (i.e., "during breaks, while no cameras were rolling").

In short, the creative process should not be confined, as Daniel argues, to a fixed place or point in time (i.e., only when the cameras are rolling). To borrow from Ernest Hemingway, the creative process, depending on the circumstances, may well be a movable feast.

21

occurred when the camera was rolling and when it was not. As Wayans explained, "[j]oking around on set is part of my creative process for making a comedy film."  According to Pressly, it is "important" on the set of any comedy to have a "light, funny atmosphere," and on the set of A Haunted House 2 "[e]veryone . . . joked around with each other as part of the creative process."

The improvisational nature of the creative process for the movie is amply demonstrated in the widely varying dialogue that was used in the three out-takes and in the final version of the scene in which Daniel appears.  In fact, Daniel's contention that Wayans's comments and conduct when the camera was rolling was completely divorced from his comments and conduct when the cameras were not rolling is flatly belied by those outtakes.  For example, Daniel contends that during breaks when the cameras were not rolling Wayans made disparaging comments about Daniel's hair—"Throughout the day, at least ten times, Wayans called my hair an 'Afro' and would start laughing." However, in one of the outtakes, Wayans's character commented repeatedly on the hair of Daniel's character, promising to get Daniel's character a "perm . . . a nice moist [Jheri] curl"[3] if he will help Wayans's character move the

---

[3] "A Jheri curl is created by a chemical process that gives black people's hair a glossy, loosely curled look. . . .  The most famous person to wear a Jheri curl likely was the late Michael Jackson during the mid-1980s." (Onwuach-Willig, *Another Hair Piece:  Exploring New*

safe off his dog.  In addition, the name given to Daniel's character, Cleveland was also born from the creative process that occurred when the cameras were not rolling—Wayans noticing and commenting on Daniel's resemblance to the cartoon character.  In other words, the evidence shows a direct linkage between the allegedly injury-producing off-camera comments and the film's creative process.

Third, Daniel's argument is bereft of any supporting evidence.  Daniel does not offer any testimony or documents rebutting the testimony by Wayans, Pressly, and Alvarez about the creative process for A Haunted House 2.  There is, in other words, no evidence showing or even suggesting that the creative process for A Haunted House 2 ceased when the cameras stopped rolling.

In short, an act is in furtherance of the right of free speech if the act helps to advance that right or assists in the exercise of that right.  (See *Lieberman v. KCOP Television, Inc.* (2003) 110 Cal.App.4th 156, 166 ["*Furtherance* means *helping* to advance, *assisting*."])  Here, the testimony and documentary evidence submitted by Wayans regarding the movie's creative process—which was uncontradicted by Daniel—established that the on-set comments and conduct

*Strands of Analysis under Title VII* (2006) 98 Geo. L.J. 1079, 1129, fn. 252; see *People v. Fudge* (1994) 7 Cal.4th 1075, 1089, 1092 [witness identification based on man's " 'jheri-curls' "]; *People v. Harrison* (2005) 35 Cal.4th 208, 231 [same].)

were done to assist Wayans in the exercise of his right to free speech—that is, to make A Haunted House 2.

     b. Issue of public interest

  The term "issue of public interest" is construed broadly in the anti-SLAPP context. (*Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450, 464.) An issue of public interest is "*any* issue in which the public is interested." (*Nygard, Inc. v. Uusi–Kerttula* (2008) 159 Cal.App.4th 1027, 1042, italics omitted.) The issue does not need to be " 'significant' " to be covered by the anti-SLAPP statute. (*Ibid*.) For example, in *Hecimovich*, a California appellate court determined that a dispute between a fourth grade basketball coach and members of a parent teacher organization regarding parental complaints about the plaintiff's abrasive coaching style constituted an issue of public interest because "the safety of children in sports" is an issue of public interest, the "suitability of [the plaintiff's] coaching style was a matter of public interest among the parents," and "problem coaches/problem parents in youth sports" is an issue of public interest. (*Hecimovich*, at pp. 467–468.) With regard to entertainment, California courts have found that there is a public interest within the meaning of the anti-SLAPP statute "in the writing, casting and broadcasting" of an episode of a popular television program. (*Tamkin v. CBS Broadcasting, Inc.*, *supra*, 193 Cal.App.4th at p. 144.)

  Here, Wayans submitted evidence that the making of A Haunted House 2 was an issue of public interest. Wayans

is a popular and prolific entertainer—since 1988, Wayans has acted in 21 films; since 1991, he has acted in 13 different television shows, specials, or movies; since 1992, he has written or co-written 16 different films and/or television movies or shows; and since 1996, he has produced or served as an executive producer of 13 different films and/or television movies or shows. The longevity and breadth of Wayans's career demonstrate continuing public interest in his work. In addition, many of Wayans's projects "involve making fun of pop culture, racial stereotypes, [and] current events," adding to the public's interest in his work. In light of Wayans's extensive body of work and the subject matter of that work, A Haunted House 2 falls easily within the anti-SLAPP statute's definition of an "issue of public interest."[4]

In sum, Wayans met his burden of making a prima facie showing that the on-set comments and conduct fell within the definition of protected activity set forth in section 425.16, subdivision (e)(4).

The dissenting opinion describes a parade of horribles that the majority opinion would unleash. But these horrible are not before us. And in any case, we agree that the examples described by the dissent would not be in furtherance of the right of free speech. Here, we only hold that Wayans's conduct, including calling Daniel nigga,

---

[4] Although A Haunted House 2 was a major theatrical production, we do not intend to suggest that smaller productions would not qualify for protection as being in the public interest.

during the creative process of molding a theatrical work is protected by free speech.

2. *The Internet posting*

The allegedly harassing and offensive Internet posting was a writing made in a place open to the public or a public forum and it was made in connection with an issue of public interest. (§ 425.16, subd. (e)(3).)

a. Statement made in a public forum

"[O]ur Supreme Court has held that *public access*, not the right to public *comment,* is the hallmark of a public forum: 'Web sites accessible to the public . . . are "*public forums*" for purposes of the anti-SLAPP statute.' " (*Nygard, Inc. v. Uusi–Kerttula, supra,* 159 Cal.App.4th at p. 1039, italics added.)

Here, both Daniel's and Wayans's declarations state that the juxtaposed pictures of Daniel and the Cleveland Brown cartoon figure and the accompanying caption were posted to Wayans's Twitter account, which had over a million followers. The Twitter account constitutes a publicly accessible social media forum. Indeed, according to Daniel's declaration, both he and his brother saw the Twitter post online. Accordingly, the Internet posting was a statement made in a public forum.

b. Issue of public interest

Although "not every Web site post involves a public issue" (*D.C. v. R.R.* (2010) 182 Cal.App.4th 1190, 1226), the bar for an anti-SLAPP defendant to overcome is not a particularly demanding one. In *Kronemyer v. Internet Movie*

26

*Database Inc.* (2007) 150 Cal.App.4th 941, the mere listing of producer credits for a movie on defendant's website was found to be "an act in furtherance of the right of free speech protected under the anti-SLAPP statute." (*Id.* at p. 947.)

Here, the posting at issue references a Twitter account that had more than one million followers (and, per Wayans's declaration, an Instagram account) for the movie A Haunted House 2, as well as Wayans's Whatthefunny Web site. As noted above, Wayans is a popular actor, writer, and producer with many films and television shows to his credit. Moreover, A Haunted House 2 was a sequel to A Haunted House (IM Global Octane 2013), which apparently was sufficiently popular and profitable to lead to financing and production of a sequel. According to Wayans's declaration, when A Haunted House 2 was released, it played in 2,310 theaters and grossed $8.8 million in its first week.

Accordingly, advance information from Wayans about the making of A Haunted House 2, including a photo of someone acting in the film, constitutes a topic of public interest, even though Daniel himself may not have been known to the public.[5] The post both referred to a topic of

---

[5] It should be noted that although Daniel may not have been widely known prior to his appearance in A Haunted House 2, he actively sought to increase his standing before the public when he agreed to act in the movie. By agreeing to appear in the movie, Daniel "voluntarily subjected [him]self to inevitable scrutiny and potential ridicule by the

widespread public interest (the film) and contributed to the public "debate" or discussion regarding the film by giving fans and those interested a glimpse of someone in the film. We therefore conclude that the Internet posting constituted protected activity as provided in section 425.16, subdivision (e)(3).

**IV.   Step two:  Daniel did not meet his burden**

In the second step of an anti-SLAPP analysis, we determine whether plaintiff has produced evidence demonstrating a probability of prevailing on his claims.

To show a probability of prevailing on his claims, " 'the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." [Citations.] . . . [T]hough the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim.' " (*Taus v. Loftus* (2007) 40 Cal.4th 683, 713–714.) " 'The plaintiff may not rely solely on its complaint, even if verified; instead, its proof must be made upon competent admissible evidence.' " (*Paiva v. Nichols* (2008) 168 Cal.App.4th 1007, 1017.)

---

public and the media."  (*Seelig v. Infinity Broadcasting Corp.* (2002) 97 Cal.App.4th 798, 808.)

28

Here, we conclude that Daniel did not meet his burden with respect to any of his claims against Wayans.[6]

A.    RACIAL HARASSMENT

Daniel's racial harassment claim against Wayans (first cause of action) is brought pursuant to the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12940 et seq.).  Although federal court rulings are not binding on the Court of Appeal, California courts "frequently turn to federal authorities interpreting Title VII of the Civil Rights Act of 1964 . . . for assistance in interpreting the FEHA . . . ." (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 463; *Mitchell v. State Dept. of Public Health* (2016) 1 Cal.App.5th 1000, 1009, fn. 4.)

In his complaint, Daniel alleges that while on the set of A Haunted House 2 he was subjected to a racially hostile work environment.  "To establish a prima facie case of a racially hostile work environment, [a plaintiff] [is] required to show that (1) he was a member of a protected class; (2) he was subjected to unwelcome racial harassment; (3) the harassment was based on race; (4) the harassment

---

[6] Both Wayans's special motion to strike and Daniel's opposition thereto addressed the fourth cause of action, which alleges a violation of the Unruh Civil Rights Act.  On appeal, however, Daniel provides no argument with respect to that cause of action.  We necessarily conclude that he has either conceded the propriety of granting the anti-SLAPP motion as to that cause of action or has forfeited any contention regarding it.

unreasonably interfered with his work performance by creating an intimidating, hostile, or offensive work environment; and (5) the [defendant] is liable for the harassment." (*Thompson v. City of Monrovia* (2010) 186 Cal.App.4th 860, 876.)

To establish the fourth element—that the harassment created a hostile work environment—a plaintiff " 'must prove that the defendant's conduct would have interfered with a reasonable employee's work performance and would have seriously affected the psychological well-being of a reasonable employee . . . .' " (*Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 130–131.) Harassment, which may be verbal, physical, or visual and "communicates an offensive message to the harassed employee" (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 706), " 'cannot be occasional, isolated, sporadic, or trivial[;] rather the plaintiff must show a concerted pattern of harassment of a repeated, routine or a generalized nature.' " (*Aguilar*, at p. 131.) Whether the harassment is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive environment "must be assessed from the 'perspective of a reasonable person belonging to the racial or ethnic group of the plaintiff.' " (*Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 263–264.) In addition, determining whether an environment is hostile requires looking at the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a

30

mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." (*Harris v. Forklift Systems, Inc.* (1993) 510 U.S. 17, 23.)

Daniel relies upon *Dee v. Vintage Petroleum, Inc.* (2003) 106 Cal.App.4th 30, for his assertion that "a single racial slur by a supervisor may also create a hostile work environment." (*Id.* at p. 36.) *Dee* involved much more than a single racial slur. The plaintiff's supervisor "called her a 'bitch' and 'constantly' used the word 'asshole.' He berated her, 'harassed' her, ordered her to lie and blamed her for tasks he ordered her to perform." (*Id.* at p. 37.) After the plaintiff complained to her supervisor about being asked to lie, the supervisor told the plaintiff that " 'it is your Filipino understanding versus mine.' " This comment was, as the Court of Appeal stated, "an ethnic slur, both abusive and hostile." (*Ibid.*) The court concluded that the evidence supported a reasonable inference that "the racial slur was not an isolated event" and that the supervisor "wished to intimidate [the plaintiff] so that she would not complain to higher management about his conduct." (*Ibid.*) The court did not hold, as Daniel asserts, that "a single racial slur by a supervisor may also create a hostile work environment." Although the *Dee* court made this statement, it preceded it with the phrase, "*[i]n other jurisdictions.*" (*Id.* at p. 36, italics added, citing *Rodgers v. Western–Southern Life Insurance Co.* (7th Cir. 1993) 12 F.3d 668, 675 (*Rodgers*).) *Dee* cannot be read as Daniel urges.

31

Daniel argues on appeal that " 'It is beyond question that the use of the word "nigger" is highly offensive and demeaning, evoking a history of racial violence, brutality, and subordination. This word is "perhaps the most offensive and inflammatory racial slur in English, . . . a word expressive of racial hatred and bigotry." ' " We agree with our Supreme Court that although " 'nigger' may once have been in common usage," it is now considered to be "particularly abusive and insulting . . . as it pertains to the American Negro." (*Alcorn v. Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 498, fn. 4.)

Nigger, however, is not the term at issue here. Rather, the term at issue is nigga. As Daniel makes clear in his declaration opposing the motion, he was not called nigger by Wayans, but nigga. Nigga is not an unambiguous racial epithet in today's world, especially when used intra-racially, as it was here. In fact, one noted legal scholar, Harvard Law professor, Randall Kennedy has observed that " '[today,] when African Americans are speaking to each other, "nigger," and especially its more genial cousin, "nigga" can be an affectionate greeting, a compliment, or a term of respect.' " (Perdu and Parks, *The Nth Degree: Examining Intraracial use of the N-word in Employment Discrimination Cases* (2014) 64 DePaul L.Rev. 65, 67; see Kennedy, Nigger: The Strange Career of a Troublesome Word (2002) p. 5 ["Currently, some people insist upon distinguishing nigger— which they see as exclusively an insult—from nigga, which

they view as a term capable of signaling a friendly salutation."].**7**)

---

**7** See Parks and Jones, "*Nigger*": *A Critical Race Realist Analysis of the N-Word within Hate Crimes Law*" (2008) 98 J.Crim. L. & Criminology 1305, 1306 ("the N-word has a different connotation when used intra-racially among Blacks than when directed at Blacks by Whites").  It should be noted, however, that others see little difference between nigger and nigga:  "whether it ends in -a or -er, the first thing that comes to mind is a negative image of a black person."  (Frost, *What is the Difference Between "Nigga" and "Nigger*" (Feb. 27, 2014), The Pioneer <http://thepioneeronline.com/20399/opinions/what-is-the-difference-between-nigga-and-nigger> [as of December 12, 2016].)

The key fact for our purposes here is that in contemporary usage nigga is not an unambiguous racial epithet, but a term which can have a number of different meanings when used by different people in different contexts.  The highly ambiguous/context-specific nature of the term nigga is captured by Dictionary.com:  "Nigga is used mainly among African Americans, but also among other minorities and ethnicities, in a neutral or familiar way and as a friendly term of address.  It is also common in rap music.  However, nigga is taken to be extremely offensive when used by outsiders.  Many people consider this word to be equally as offensive as nigger." (<http://www.dictionary.com/browse/nigga?s=t>).

To borrow from and paraphrase Professor Kennedy, "[m]ore vividly than most words, then [nigga] illustrates Justice Oliver Wendell Holmes's observation, that 'a word is

33

Wayans introduced evidence that nigga as used by him—generally and on the set of A Haunted House 2—and as received by others working on the movie was not a racial slur, but a term of endearment.  In rebuttal, Daniel stated that, regardless of how others found Wayans's use of the term, he found the term personally offensive when directed at him.  But Daniel limited his rebuttal to only his subjective perspective.  In other words, Daniel did not introduce any evidence showing that an objectively reasonable Black actor in his situation would also find the term offensive such that its usage would unreasonably interfere with his work performance.  Under the law that is not a sufficient showing.  (See *Hope v. California Youth Authority* (2005) 134 Cal.App.4th 577, 588 ["harassment must satisfy an objective *and* a subjective standard"] italics added.)

Moreover, the evidence introduced below suggests the contrary to Daniel's claim—that is, a reasonable Black actor who voluntarily agreed to participate in a movie addressing racial stereotypes that was written, produced and starred Wayans—an artist known for his frequent use of both nigger and nigga in his work[8]—would be on notice that potentially

---

not a crystal, transparent and unchanged, . . . [it is] the skin of a living thought [and] may vary greatly in color and content according to the circumstances and the time in which it is used.'"  (Kennedy, Nigger:  The Strange Career of a Troublesome Word, *supra*, at p. 55.)

[8] In the original Haunted House, the word nigga was used "numerous times" and in another prior movie in which

racially charged language would be used in the film, and, given the improvisational nature of the production, that such language might be used among the actors and production staff when the cameras were not rolling to help develop storylines and dialogue.  Consequently, under the facts of this case the use of the term nigga did not create a " 'hostile or abusive work environment.' " (*Aguilar v. Avis Rent A Car System, Inc.*, *supra*, 21 Cal.4th at p. 130.)

The doubts about Daniel's ability to prevail on his racial harassment claim are raised to a fatal level when he fails to mention, let alone discuss, how the use of the allegedly offensive language adversely affected him in his work for the movie and would have affected a reasonable Black actor's performance.  Although Daniel states that Wayans's alleged harassment made him feel "self-conscious, insecure," "humiliated," and "embarrassed" while he was on the set, his declaration is completely and tellingly silent with regard to how Wayans's on-set comments and conduct adversely affected his work performance that day.  None of the other declarants who were on the set that day—Wayans, Pressly, and Alvarez—observed Daniel having any trouble in performing his duties.  None of the declarants, including Daniel himself, states, for example, that his scene had to be reshot and/or delayed in being shot because Daniel was plainly troubled by something that occurred when the

Wayans starred, authored, and produced, the word nigger was used 55 times in the final, released version of the film.

cameras were not rolling and, as a result, he was unable to get into character and/or perform his role in an efficient and effective manner. The only reasonable conclusion that can be drawn from such silence is that the alleged racial harassment had no adverse effect on Daniel's work performance.[9]

---

[9] One of the cases upon which Daniel relies, *Rodgers*, *supra*, 12 F.3d 668, illustrates how big of a gap there is between Daniel's allegations of a hostile work environment and what courts have actually found to be a hostile work environment. In *Rodgers*, the plaintiff's supervisor, a White man, who also hired the plaintiff, a Black man, used profanity and personal insults to motivate the plaintiff and other subordinates. The insults included unambiguous racial remarks—including the use of the word nigger—as well as many race-neutral epithets over the course of 12 years. (*Id.* at p. 671.) In addition to verbal abuse, the plaintiff's supervisor on one occasion dumped out the contents of the plaintiff's desk. (*Ibid.*) As a result of the "harsh treatment and racist language," plaintiff suffered a number of physical problems for which he sought medical treatment. (*Ibid.*) Despite the job-related stress resulting from the harsh treatment and racial insults, the plaintiff continued to work for the defendant. (*Ibid.*) However, the stress became so severe that the plaintiff repeatedly asked for a demotion and when the last of those requests were refused, he resigned. (*Id.* at p. 672.) Here, in contrast to the plaintiff in *Rodgers*, Daniel was exposed to a handful of arguably racist comments and some arguably offensive but race-neutral comments over the course of a single work day, comments which apparently did not interfere with his work

In sum, looking, as we must, at the totality of the circumstances, the alleged acts of racial harassment here did not alter the conditions of Daniel's employment and create an abusive environment. Even when we credit Daniel's evidence, that evidence is insufficient as a matter of law to sustain a judgment favorable to him. Accordingly, we hold that the trial court properly struck Daniel's racial harassment claim against Wayans.

B. MISAPPROPRIATION

Daniel's claims for statutory and common law misappropriation of name and likeness (fifth and sixth causes of action) are based solely on the Internet posting. Daniel failed to meet his burden of showing a probability of prevailing with respect to these claims for two reasons: first, Daniel failed to overcome evidence that he waived his claims when he signed the voucher, which contained a broad release consenting to the use of his image in connection with the movie; second, even if Daniel did not release his claims or the voucher was inadmissible, Wayans's transformative use of Daniel's photograph established a complete defense.

1. *The voucher*

An essential element for either a common law or statutory misappropriation claim is the unauthorized use of

---

performance at all or force him to seek reduced responsibilities or any other on-the-job relief from the alleged misconduct. Nor does the record reflect that the alleged harassment has caused Daniel to seek any subsequent medical treatment.

plaintiff's image.  (See *Kirby v. Sega of American, Inc.* (2006) 144 Cal.App.4th 47, 55 [common law misappropriation claim]; *Montana v. San Jose Mercury News, Inc.* (1995) 34 Cal.App.4th 790, 793 [statutory misappropriation claim].) As discussed above, the voucher contains a broad release regarding the use of Daniel's image "in *any* manner whatsoever and for *any* reason in connection with The Production."  (Italics added.)

On appeal, Daniel makes two related arguments: (a) the trial court improperly overruled his objection to the voucher on authentication grounds; and (b) the voucher does not establish that the release runs in favor of Wayans.  We do not find either argument to have merit.

a.     The trial court did not err by overruling Daniel's authentication objection to the voucher

"Evidentiary challenges [on a anti-SLAPP motion] are reviewed only for abuse of discretion.  [Citation.]  As such, we will not overturn an evidentiary ruling on appeal unless 'the trial court exceeded the bounds of reason, all of the circumstances before it being considered.' " (*Public Employees' Retirement System v. Moody's Investors Service, Inc.* (2014) 226 Cal.App.4th 643, 683.)

"[W]hile all writings must be authenticated before they are received into evidence ([Evid. Code,] § 1401), the proponent's burden of producing evidence to show authenticity ([Evid. Code,] § 1400) is met 'when sufficient evidence has been produced to sustain a finding that the document is what it purports to be.  [Citation.]' [Citation.]

38

The author's testimony is not required to authenticate a document ([Evid. Code,] § 1411); instead, its authenticity may be established by the contents of the writing ([Evid. Code,] § 1421) or by other means ([Evid. Code,] § 1410 [no restriction on 'the means by which a writing may be authenticated']). 'As long as the evidence would support a finding of authenticity, the writing is admissible. The fact conflicting inferences can be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility. [Citations.]' [Citation.] ' "[L]ike any other material fact, the authenticity of a [document] may be established by circumstantial evidence . . . ." ' " (*People v. Valdez* (2011) 201 Cal.App.4th 1429, 1435.)

Here, Wayans presented sufficient circumstantial evidence for the trial court to find that the document had been authenticated. As discussed above, the voucher was attached as an exhibit to Alvarez's declaration. The voucher indicates that the production or project name is "Dumb Ass Prod.," not A Haunted House 2. However, Alvarez stated in his declaration that the "production company for A Haunted House 2 was Dumb Ass Productions, which is why that company is listed on the [voucher]." (Italics omitted.) In addition, Alvarez indicated in his declaration that he was in a position to have personal knowledge of the corporate entities involved in the making of the movie, as well as the vouchers used with extras, such as Daniel, and Daniel's execution of the voucher. Alvarez states that as the coproducer of the movie he was responsible for "oversee[ing]

39

the *entire* production." (Italics added.) In addition, Alvarez states he was "on the set the one day that Mr. Daniel was on the set and was present during the shooting of the scene in which Mr. Daniel appeared."

From the facts in Alvarez's declaration, it can be readily inferred that the voucher was a true and accurate copy of the document that Daniel signed allowing him to be present on the set of A Haunted House 2 and to work as an extra on that movie on September 4, 2013. (Daniel does not dispute that he signed the voucher or that the voucher contains his address, phone number and redacted social security number.) Accordingly, the trial court, considering all of the facts before it, did not exceed the bounds of reason by overruling Daniel's objection.

                  b.     The voucher's release extends to Wayans

Daniel asserts that there is "nothing in this record to demonstrate that Wayans was entitled to the benefit of the contract between Daniel and Dumb Ass Productions." Daniel's assertion is incorrect. As discussed above, Alvarez states in his declaration that Dumb Ass Productions is the production company responsible for making A Haunted House 2. Both Alvarez and Wayans identify Wayans as one of the movie's coproducers. Those two undisputed facts are sufficient for purposes of an anti-SLAPP motion to show that the voucher's broad release includes Wayans.

2. *Wayans's use of Daniel's image was transformative*

The freedom of expression protected by the First Amendment exists to preserve an uninhibited marketplace of ideas and to further individual rights of self expression. (*Winter v. DC Comics* (2003) 30 Cal.4th 881, 887 (*Winter*).) The protections may extend to all forms of expression, including written and spoken words (fact or fiction), music, films, paintings, and entertainment, whether or not sold for a profit. (*Comedy III Productions, Inc. v. Gary Saderup, Inc.* (2001) 25 Cal.4th 387, 406 (*Comedy III*).)

In *Comedy III*, *supra*, 25 Cal.4th 387 and again in *Winter*, *supra*, 30 Cal.4th 881, our Supreme Court addressed the balance between an individual's right to control the commercial exploitation of his or her likeness or identity and the First Amendment right of free expression. (See *Comedy III*, at p. 400; *Winter*, at pp. 887–888.) In *Comedy III*, the court held a defendant may raise the First Amendment as an affirmative defense to an allegation of appropriation if the defendant's work " 'adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message . . . .' " (*Id.* at p. 404.) In other words, the new work must contain significant "transformative elements." (*Id.* at pp. 406–407.)

The transformative test is straightforward: The "inquiry is whether the celebrity likeness is one of the 'raw materials' from which an original work is synthesized, or whether the depiction or imitation of the celebrity is the very

41

sum and substance of the work in question." (*Comedy III*, *supra*, 25 Cal.4th at p. 406.) If the "product containing the celebrity's likeness is so transformed that it has become primarily the defendant's own expression" of what he or she is trying to create or portray, rather than the celebrity's likeness, it is protected. (*Id.* at pp. 406–407.) In developing the test, the *Comedy III* court made two important observations. First, the right to control one's image "cannot, consistent with the First Amendment, be a right to control the . . . image by censoring disagreeable portrayals. . . . [T]he First Amendment dictates that the right to comment on, parody, lampoon, and make other expressive uses of the celebrity image must be given broad scope." (*Id.* at p. 403.) Second, "in determining whether the work is transformative, courts are not to be concerned with the quality of the artistic contribution—vulgar forms of expression fully qualify for First Amendment protection." (*Id.* at p. 407.) In short, all that is necessary is that the defendant's work add " 'something new, with a further purpose or different character, altering the first with new expression, meaning, or message.' " (*Id.* at p. 404.) A work is transformative if it adds " 'new expression.' " That expression alone is sufficient; it need not convey any " 'meaning or message.' " (*Ibid.*)

Applying this test in *Comedy III*, *supra*, 25 Cal.4th 387, which involved drawings depicting The Three Stooges, and T-shirts made from those drawings, the court concluded the drawings and T-shirts were not entitled to First Amendment

protection. The artist who created them, while highly skilled, contributed nothing other than a trivial variation that transformed the drawings from literal likenesses of the three actors. (*Id*. at pp. 408–409.)

The Supreme Court applied the transformative test again two years later in *Winter*, *supra*, 30 Cal.4th 881. In that case, the defendant published a series of comics featuring two half-worm, half-human characters based on singers Edgar and Johnny Winter. Both characters had long white hair and albino features similar to the Winter brothers, while one wore a hat similar to one often worn by Johnny Winter. (*Id*. at p. 886.) The Winter brothers sued for statutory appropriation and lost on summary judgment. The Court of Appeal affirmed in part, reversed in part, and remanded. The Supreme Court, however, granted review. Applying the transformative test, the court found for the defendants, holding that the comic depictions contained significant expressive content beyond the Winters' mere likenesses and were "entitled to First Amendment protection." (*Id*. at pp. 890, 892.) As the Supreme Court explained, the Winters were merely part of the raw material from which the comics' plot and characters were fashioned. In addition, the characters were distorted pictures of the Winters for the purpose of lampoon, parody or caricature. In short, and in stark contrast to the near literal depictions of the Three Stooges in *Comedy III*, *supra*, 25 Cal.4th 387, the comic book characters depicted were "fanciful, creative

43

characters, not pictures of the Winter brothers." (*Winter*, at p. 892.)

Here, although Wayans used two unaltered images—one of Daniel and one of the Cleveland Brown character—his use of those images was nonetheless transformative. Wayans's use was transformative in the combination of the juxtaposed images *with* his commentary. That combination of images and arguably humorous commentary provided the Internet posting with an element of caricature, lampoon, or parody. It is this element that puts the Internet posting within the protection of the First Amendment. In other words, Wayans's juxtaposition of Daniel's image with the image of the Cleveland Brown character and his caption added " 'something new' " to Daniel's image, altering it with a " 'new expression, meaning, or message.' " (*Comedy III*, *supra*, 25 Cal.4th at p. 404.)

In sum, because the voucher was authenticated and because its release is not only broad but can reasonably be read to extend to Wayans, Daniel failed to show a probability of prevailing. Alternatively, even if the voucher had not been authenticated, or the evidence was insufficient to show that its release extended to Wayans, the Internet posting was a transformative use of Daniel's image and, as a result, Wayans has an affirmative defense to Daniel's misappropriation claims. In light of the voucher's release and the Internet posting's transformative use, the trial court properly struck the misappropriation claims.

44

C.    FALSE LIGHT

" 'One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.' " (5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 673, p. 988.)  A "false light" cause of action is a variety of defamation and is subject to the same requirements.  (*Aisenson v. American Broadcasting Co.* (1990) 220 Cal.App.3d 146, 161.)

"In determining whether a statement is libelous we look to what is explicitly stated as well as what insinuation and implication can be reasonably drawn from the communication." (*Forsher v. Bugliosi* (1980) 26 Cal.3d 792, 803.)  " ' "[I]f the defendant juxtaposes [a] series of facts so as to imply a defamatory connection between them, or [otherwise] creates a defamatory implication . . . he may be held responsible for the defamatory implication, . . . even though the particular facts are correct." ' "  (*Weller v. American Broadcasting Companies, Inc.* (1991) 232 Cal.App.3d 991, 1003, fn. 10.)  A court examines the totality of the circumstances, including the context in which the statement was made.  (*Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 260–261.)  Opinions are constitutionally protected and cannot form the basis of a

45

defamation-type claim. (*Id.* at p. 260.) Whether a statement constitutes a statement of fact or opinion is a question of law. (*Ibid.*) "In making such a determination, the court must place itself in the position of the hearer or reader, and determine the sense or meaning of the statement according to its natural and popular construction." (*Ibid.*) Based on the language used and the totality of the surrounding circumstances, the court determines whether the average reader or hearer "could have reasonably understood the alleged defamatory statement to be one of fact." (*Id.* at p. 261.) "Photographs are not actionable if they are fair and accurate depictions of the person and scene in question, even if they place the person in a less than flattering light, so long as the photographs do not surpass the limits of decency by being highly offensive to persons of ordinary sensibilities." (*Aisenson v. American Broadcasting Co.*, *supra,* 220 Cal.App.3d at p. 161.)

Here, the Internet posting referred only to Daniel's physical resemblance to the Cleveland Brown cartoon character. It twice expressly referred to how Daniel looked. It did not insinuate or imply that Daniel shared any personality characteristics or, as Daniel argues, "suggest[ ] that Daniel is a real-life incarnation of the cartoon figure." Moreover, it was a combination of an expression of an opinion by Wayans that Daniel looked like Cleveland Brown and an accurate photographic comparison. Accordingly, Daniel did not show a probability of prevailing on his false light claim, and the trial court properly struck it.

46

D.    QUASI-CONTRACT

Daniel's quasi-contract claim (eighth cause of action) is based solely on the Internet posting. According to the complaint, Wayans obtained an improper "benefit" from using Daniel's likeness in the Internet posting. The Internet posting, according to the complaint, was improper because the photograph of Daniel used in that posting was taken "without [his] consent."

"[I]t is well settled that an action based on an implied-in-fact or quasi-contract cannot lie where there exists between the parties a valid express contract covering the same subject matter." (*Lance Camper Manufacturing Corp. v. Republic Indemnity Co.* (1996) 44 Cal.App.4th 194, 203; *Rutherford Holdings, LLC v. Plaza Del Rey* (2014) 223 Cal.App.4th 221, 231.)

Here, there was a valid express contract covering the use of Daniel's photograph in connection with A Haunted House 2, the voucher. By signing the voucher, Daniel not only gave Wayans the right to use his photograph "in any manner whatsoever and for any reason" in connection with the movie, but also acknowledged that the wages he received for his work on the movie were "payment in full"—that is, he is not entitled to any other payment, including payment for the use of his photograph. Because Daniel did not show a probability of prevailing on his quasi-contract claim, the trial court properly struck it.

47

E.    UNJUST ENRICHMENT

Like his quasi-contract claim, Daniel's claim for unjust enrichment is based solely on the Internet posting. Technically, "[u]njust enrichment is not a cause of action, . . . or even a remedy"; it is instead a principle or state "describing ' "the result of a failure to make restitution." ' " (*McBride v. Boughton* (2004) 123 Cal.App.4th 379, 387.)  However, because this appeal concerns an anti-SLAPP motion, we disregard how a plaintiff may have styled or labeled a particular cause of action and focus instead on the claim's merits.  (*Hylton v. Frank E. Rogozienski, Inc.* (2009) 177 Cal.App.4th 1264, 1272.)

Daniel's claim for unjust enrichment suffers from two related problems.  First, a party to an express contract can assert a claim for restitution based on unjust enrichment by only " 'alleg[ing in that cause of action] that the express contract is void or was rescinded.' " (*Rutherford Holdings, LLC v. Plaza Del Rey*, *supra*, 223 Cal.App.4th at p. 231.) Here, Daniel does not allege in his complaint and has not demonstrated in his declaration opposing Wayans's motion that the voucher was void or rescinded.

Second, and more substantively, Daniel's unjust enrichment claim suffers from many of the same problems that bedevil his quasi-contract claim:  Daniel:  (1) was hired as a non-speaking extra in a one day role; (2) was paid in full for his services; (3) acknowledged in writing that he received "payment in full"; and (4) released any right to any use of his

48

image in connection with the promotion of A Haunted House 2. Consequently, Daniel failed to show a probability of prevailing on his quasi-contract claim, and the trial court properly struck it.

F.      INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Daniel's claim for the intentional infliction of emotional distress is based on both the on-set comments and conduct and the Internet posting.

The elements of a prima facie case for the tort of intentional infliction of emotional distress are: " ' " '(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct. . . .' " ' " (*Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 1001; *Hughes v. Pair* (2009) 46 Cal.4th 1035,1050.) " ' "Conduct to be outrageous must be so extreme as to exceed all bounds of that usually tolerated in a civilized community." ' " (*Potter*, at p. 1001.) However, "liability 'does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities,' but only to conduct so extreme and outrageous 'as to go beyond all possible bonds of decency . . . .' " (*Alcorn v. Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 499, fn. 5; *Hughes*, at p. 1051.)

Here, the allegedly outrageous conduct consisted of a number of boorish and/or juvenile comments about Daniel's

49

physical appearance, the use of the term nigga, which in contemporary usage may or may not be a term of endearment among African Americans depending on the circumstances, and an arguably comic juxtaposition of photographs on the Internet. Although Daniel may have found such conduct hurtful, under all the circumstances Wayans's conduct was not so extreme as to exceed all bounds of that usually tolerated in a civilized community. Rather, the alleged misconduct falls more in the category of insults, indignities, annoyances, and petty oppressions. Accordingly, the trial court properly struck this claim.

## V.    Attorney fees award

The trial court, pursuant to section 425.16, subdivision (c), awarded Wayans his attorney fees as the prevailing party. Daniel does not challenge the amount of those fees. Instead, his challenge to those fees is a global one—that is, Wayans was not entitled to those fees because his anti-SLAPP motion should not have been granted. Because we hold that the trial court properly granted Wayans's anti-SLAPP motion, we further hold that the award of attorney fees was proper.

50

## DISPOSITION

The judgment and order granting the anti-SLAPP motion and dismissing the complaint are affirmed.  The order granting Marlon Wayans's attorney fees is also affirmed.  Marlon Wayans is awarded his costs on appeal.

CERTIFIED FOR PUBLICATION.


                                JOHNSON, J.


I concur:


    ROTHSCHILD, P. J.

51

LUI, J., Concurring and Dissenting.

Although I agree with the majority on some of its analysis, I disagree with the majority's conclusions concerning both the scope of the creative process and the scope of the release that appellant Pierre Daniel (Daniel) signed. I also believe that Daniel demonstrated a reasonable probability that he would prevail on his cause of action for intentional infliction of emotional distress. Accordingly, I would reverse the trial court's ruling in part and permit Daniel's action to proceed on claims relating to both the alleged on-set conduct of respondent Marlon Wayans (Wayans) and to his Internet posting.

Because this is an appeal from an order granting an anti-SLAPP motion, we must accept the "plaintiff's evidence as true." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 385 (*Baral*).) We evaluate the defendant's showing "only to determine if it defeats the plaintiff's claim as a matter of law." (*Ibid.*) Under that standard, we are faced with the following facts.

Daniel was hired for one day as an extra on a movie, A Haunted House 2. While on the set, when no filming was occurring, the producer, cowriter and star of the movie, Wayans, repeatedly called Daniel " 'nigga' " and a " 'black fat ass,' " mocked him for his " 'Afro' " hairstyle, approached Daniel while sneering, leering and rolling his eyes, compared Daniel to an unflattering character (Cleveland Brown) in the animated series *Family Guy*, and generally treated him in a demeaning and abusive manner. Daniel had no prior

relationship with Wayans and did not participate in this insulting conduct that Wayans characterized as "joking." Indeed, he testified that he walked away.

The insulting conduct was not limited to the set. Without Daniel's permission, Wayans took Daniel's picture on Wayans's cell phone. Wayans posted the picture on his personal Twitter account next to a picture of the Cleveland Brown animated character with a caption comparing " 'this nigga' " (Daniel) to " 'THIS NIGGA' " (Cleveland Brown). Many people saw the pictures, resulting in repeated embarrassing questions as to whether Daniel is the " 'Cleveland Brown' " character from Wayans's post.

1. ***Wayans's on-set conduct, as alleged, was not in furtherance of his constitutional right to free speech***

The majority concludes that Wayans's alleged on-set conduct was protected under the anti-SLAPP statute because it was part of the creative process of making the movie. (Code Civ. Proc., § 425.16, subd. (e)(4).)[1] The majority observes that Daniel did not rebut Wayans's evidence that creation of the movie involved a great deal of on-set improvisation both before and during filming, along with a " 'light, funny atmosphere' " in which " '[e]veryone . . . joked around with each other as part of the creative process.' " (Maj. opn. *ante*, at p. 22.)

---

[1] Subsequent undesignated statutory references are to the Code of Civil Procedure.

2

The problem with this analysis is that Daniel did not willingly participate in this creative process. Under Daniel's version of events—which we must accept on this appeal—he was not a collaborator in a crass but collegial brainstorming session. He did not know Wayans. He was not hired to be a writer or creative consultant. He was an extra hired for one day to be a "non-descriptive furniture mover who would be assisting in moving boxes in and out of a house." He was the target of, not a participant in, others' demeaning and offensive humor.

The humor was racially charged. We have no reason to question Wayans's claim that he commonly uses the term " 'nigga' " as a term of endearment with friends of all races. But it hardly stretches credibility when Daniel claims that the use of such an historically fraught term offended and insulted *him*.[2] Most important, it is not our role to decide

---

[2] The majority engages in a scholarly discussion of the evolution of, and differences between, the terms "nigger" and "nigga" and the current offensive and inoffensive usages of the terms. But the key component of that analysis is that the meaning of the terms depends upon the circumstances. As the majority explains, the term " 'nigga' " "can have a number of different meanings when used by different people in different contexts." (Maj. opn. *ante*, at p. 33, fn. 7.) No one can seriously question that either term can be highly offensive when used in an offensive manner. Indeed, in recognition of the term's connotations, in 2007 the NAACP held a mock funeral for the "N" word, complete with a horse drawn carriage carrying "a wooden coffin that adorned black

credibility. We accept Daniel's testimony that he was offended and evaluate the circumstances in which the offensive conduct occurred.

Daniel's claim that the conduct at issue here was specifically directed *at him* creates a critical difference between the facts of this case and the facts in *Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264 (*Lyle*), which the majority suggests provides "insights about the creative process for developing a somewhat raunchy comedy." (Maj. opn. *ante*, at p. 20, fn. 2.) In *Lyle*, a former comedy assistant on the television show *Friends* brought a claim for sexual harassment based upon sexually explicit language that the male writers used. In affirming summary judgment, our Supreme Court was careful to note that the record showed that the sexual antics and discussions at issue "did not involve and were not aimed at plaintiff or any other female employee." (*Lyle*, at p. 287.) Here, the conduct at issue was allegedly aimed at Daniel.

In his concurring opinion in *Lyle*, Justice Chin explained that protection of the creative process is particularly important in lawsuits that are "directed at restricting the creative process in a workplace *whose very*

---

roses and a ribbon with the word 'nigga' displayed." (<http://www.naacp.org/latest/the-n-word-is-laid-to-rest-by-the-naacp> [as of Feb. 8, 2017].) The context that Daniel describes in this case is use of the term " 'nigga' " by one person (Wayans) to refer to another person (Daniel) who found the term "racially offensive and derogatory."

4

*business is speech related.*" (*Lyle*, *supra*, 38 Cal.4th at p. 297 (conc. opn. of Chin, J.).) But he also concluded that, "[j]ust as criminal threats are not protected, just as no one has the right to falsely shout 'fire' in a crowded theater, limits exist as to what may occur in the writers' room." (*Id.* at p. 299.) Even in that context, "speech that is *directed*, or 'aimed at a particular employee because of her race, sex, religion, or national origin,' is not protected." (*Ibid.*, quoting Volokh, *Freedom of Speech and Workplace Harassment* (1992) 39 UCLA L.Rev. 1791, 1846.) I would draw that same line here.

The record in this case supports such a limit. Wayans did not claim that offensive conduct *targeting* a particular person is part of his creative process. Rather, he testified that Daniel was "laughing and joking" along with the rest of the cast and claimed that Daniel never objected or suggested that "he was uncomfortable in any way with the joke."[3] His costar, Jaime Pressly, went even further in explaining the nature of the creative process that Wayans employed on the set. She testified that '[t]he practice on set is that if anyone is uncomfortable with anything that is said, we take it back and agree not to use it. As part of his practice, Mr. Wayans makes sure that the subject of the joke is okay with the joke." Thus, Wayans himself apparently does not believe

---

[3] Parents might recognize a common defense to jokes that bring their child to tears: "We're not laughing *at* you, we're laughing *with* you." The child's typical response, "But I'm not laughing," is equally appropriate here. According to Daniel, he was not laughing.

that the creative process must extend to conduct that directly offends a cast member.

There are no discernible limits to the conduct that would be protected under the majority's interpretation of the creative process. What if, for example, a producer/writer/actor claimed that he needed to inspire his creative muse by repeatedly using racial epithets toward and mocking the appearance of a caterer who happened to be near the set? Or what if he engaged in unwanted sexual conduct with a female extra during a lunch break as a way to try out a new joke? Or parodied a disabled production assistant? Under the majority's analysis, it seems that a writer or actor has free rein to insult and degrade others so long as he or she claims that it somehow helps him or her to make movies.

True, victims of such conduct might get past an anti-SLAPP motion if they manage to convince a court that they will probably succeed on their claims. But requiring them to make such a showing before they have even had an opportunity for discovery is an unwarranted extension of the prelitigation screening authorized by the anti-SLAPP statute and stretches the definition of conduct that is "in furtherance of" the constitutional right of free speech beyond any reasonable bound. (§ 425.16, subd. (e)(4).)

I recognize, of course, that the anti-SLAPP statute is to be broadly construed and that to prevail on an anti-SLAPP motion a defendant need not prove that the plaintiff's motive in bringing the lawsuit was actually to chill the exercise of

6

the defendant's constitutional rights or that the action has actually had a chilling effect on the exercise of such rights. (§ 425.16, subd. (a); *Navellier v. Sletten* (2002) 29 Cal.4th 82, 88.) The scope of the anti-SLAPP statute therefore can extend beyond the "quintessential" SLAPP, which is "filed by an economic powerhouse to dissuade its opponent from exercising its constitutional right to free speech or to petition." (*Nam v. Regents of University of California* (2016) 1 Cal.App.5th 1176, 1193 (*Nam*).)

However, in considering how far to extend the definition of the creative process for purposes of anti-SLAPP protection, it is appropriate to consider the stated legislative purpose of the anti-SLAPP statute, which is to address "lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." (§ 425.16, subd. (a); *Nam, supra,* 1 Cal.App.5th at pp. 1189, 1193.) The record of this case does not suggest that permitting a lawsuit by an extra for racially offensive conduct directed toward him on the set would have any effect on the content of movies or the creative process for making them. While improvisation and racially tinged bantering might be a part of Wayans's creative process, there is no reason to believe that this process must include conduct amounting to racial harassment of a subordinate employee. To the contrary: As discussed above, Wayans's evidence showed that his typical creative process was intended to be collaborative and to make sure that no one is made to feel uncomfortable.

7

On the other hand, extending the definition of the creative process to encompass such conduct does threaten to chill meritorious lawsuits with the prospect of losing an anti-SLAPP motion. Individuals such as Daniel—who is hardly an "economic powerhouse" in the hierarchy of Hollywood—are far more likely to be intimidated by the possibility of a substantial attorney fee award than they are to file suit for the purpose of intimidation. (See *Nam*, *supra*, 1 Cal.App.5th at pp. 1188–1189 [anti-SLAPP law "was designed to ferret out meritless lawsuits intended to quell the free exercise of First Amendment rights, not to burden victims of discrimination and retaliation with an earlier and heavier burden of proof than other civil litigants and dissuade the exercise of their right to petition for fear of an onerous attorney fee award"].)

In concluding that the conduct at issue here—alleged racially offensive and degrading comments specifically aimed at Daniel—should not be considered in furtherance of constitutionally protected free speech, I do not suggest that the trial court should have evaluated the merits of Daniel's racial harassment claim as part of the first step in the SLAPP analysis. The relevant distinction here is not between conduct that would or would not support a harassment claim. Rather, the important distinction for purposes of defining the contours of the creative process is between creative collaboration, even if it includes offensive topics, and demeaning conduct that is directed at a specific person. The latter is outside the bounds of constitutionally

8

protected free speech. (*Lyle, supra*, 38 Cal.4th at pp. 299–300 (conc. opn. of Chin, J.).)

Therefore, I would hold that, with respect to Wayans's alleged on-set conduct, Wayans failed to prove the first step of his anti-SLAPP motion. The alleged conduct was not in furtherance of his constitutional right of free speech, and the trial court should have permitted Daniel's claim for racial harassment to proceed with respect to such conduct. For the same reason, the trial court should have permitted Daniel's 10th cause of action for intentional infliction of emotional distress to proceed with respect to Wayans's alleged on-set conduct.

2. ***Wayans failed to provide evidence sufficient to show that the scope of Daniel's release extended to Wayans's Internet posting***

I agree with the majority that the "allegedly harassing and offensive Internet posting was a writing made in a place open to the public or a public forum and it was made in connection with an issue of public interest." (Maj. opn. *ante*, at p. 26; § 425.16, subd. (e)(3).) The trial court therefore properly concluded that Wayans met his burden with respect to the first step of the SLAPP analysis with respect to the Internet posting.

However, I disagree with the majority's analysis of the second step of the anti-SLAPP inquiry concerning the merits of Daniel's claims. The majority accepts Wayans's argument that Daniel executed a broad union voucher that precludes his claims for statutory and common law misappropriation of

9

likeness (Daniel's fifth and sixth causes of action) and for implied contract and unjust enrichment (Daniel's eighth and ninth causes of action). In my view, Wayans did not meet his burden to show that the scope of the consent that Daniel provided in the voucher extended to Wayans's Internet posting.

Wayans's only evidence concerning the scope of the union voucher was the voucher itself and two sentences in a declaration submitted by a producer and cowriter of A Haunted House 2, Rick Alvarez. The Alvarez declaration purports to identify the voucher as a "Standard Union Voucher" that Daniel signed, and states that "Dumb Ass Productions" was a production company for A Haunted House 2, "which is why that company is listed on the Standard Union Voucher."

The voucher, which bears the signature "Pierre Daniel," grants to the "Production Company of The Production, its successors, assignees, licensees or any other person or company who might gain title or rights to the production, the right to photograph me and record my voice to use, alter, dub, edit and or otherwise change such photographs and recordings, in any manner whatsoever and for any reason in connection with The Production, such right to be worldwide and in perpetuity." The only identification of "The Production" appears in a field for "PRODUCTION & PROJECT NAME," which lists "Dumb Ass Prod." The voucher does not mention Wayans or A Haunted House 2.

I do not believe that this evidence is sufficient as a matter of law to overcome Daniel's testimony that Wayans did not have his consent to take his picture and to post it on the Internet. (*Baral*, *supra*, 1 Cal.5th at p. 385 [defendant's showing must "defeat[ ] the plaintiff's claim as a matter of law"].) The record does not establish that the consent in the voucher (1) applied to Wayans or (2) applied to the use that Wayans made of it.

The majority concludes that Wayans was entitled to the benefit of the release because there was evidence that Dumb Ass Productions was a production company for A Haunted House 2 and Wayans was a coproducer of the movie. (Maj. opn. *ante*, at p. 40.) But there was no evidence of any connection between Wayans and Dumb Ass Productions, which is the only entity identified on the voucher. Thus, there is insufficient evidence to show that Wayans either was acting on behalf of Dumb Ass Productions in making the Internet post or was one of the "successors, assignees, licensees" of Dumb Ass Productions or a person with rights to the production.

There was also insufficient evidence to establish that Wayans was acting "in connection with The Production" in making that post. Wayans made the post to his own Twitter account. The only connection to A Haunted House 2 was a link to the movie's Twitter and Instagram pages, which Wayans included along with a link to his own Web site. Wayans's declaration does not address *why* he made the post. According to Daniel, Wayans took Daniel's picture on

11

Wayans's cell phone without Daniel's knowledge or permission during a break. There is a difference between photography done for the purpose of filming and photography allegedly done during a break on a personal device for the purpose of posting on a personal Twitter account. Without more evidence to show that Wayans's particular use of Daniel's picture was "in connection with The Production" as contemplated by the standard release in the union voucher, I would not preclude Daniel's claim as a matter of law.

I am also not persuaded that Wayans's Internet post was a "transformative use" of Daniel's likeness as a matter of law. The Internet post in issue in this case contained no significant transformative elements. Wayans used Daniel's photo not as raw material for an original work, but as a literal depiction of Daniel's appearance and a literal depiction of the appearance of cartoon character Cleveland Brown. Wayans simply repackaged the two images together and added a caption remarking upon the resemblance of the two. This was not a transformation that was primarily Wayans's own expression. Thus, the facts here are closer to the use of the literal likeness of The Three Stooges in *Comedy III Production, Inc. v. Gary Saderup, Inc.* (2001) 25 Cal.4th 387, 408, than to the comic book illustrations of "fanciful, creative characters" in *Winter v. DC Comics* (2003) 30 Cal.4th 881, 892.

3.	***Daniel demonstrated a reasonable probability that he would succeed on his claim for intentional infliction of emotional distress***

Because I conclude that Wayans's Internet posting was protected free speech under the anti-SLAPP statute, it is necessary to consider whether Daniel showed that he had a reasonable probability of prevailing on his claim that the Internet post referring to him as "nigga" and comparing his picture to the picture of Cleveland Brown amounted to intentional infliction of emotional distress.[4]  I conclude that he did.

The majority finds that Wayans's alleged conduct, including the Internet post, "was not so extreme as to exceed all bounds of that usually tolerated in a civilized community," but was "more in the category of insults, indignities, annoyances, and petty oppressions."  (Maj. opn. *ante*, at p. 50.)  For the reasons discussed earlier, I disagree that Wayans's use of the term "nigga" in his post to refer to Daniel was not extreme as a matter of law.  Again, context is important.  Daniel saw the post after a day in which he claims Wayans subjected him to in-person racial harassment and demeaning treatment.  If, as he claims, he was the

---

[4] As mentioned, I believe that Wayans's alleged on-set conduct was not protected free speech activity, and it is therefore unnecessary to reach the question whether Daniel's evidence was sufficient to support a claim for intentional infliction of emotional distress on that aspect of his claim.

13

target of racial insults by Wayans previously, it was reasonable to expect that he would react to the term "nigga" in the Internet post as more of the same. It was also highly foreseeable that Wayans's comparison of Daniel to an unflattering African-American animated character on Wayans's personal Twitter account—which he testified had over a million followers—could cause extreme distress. Daniel testified that it did, claiming that he lost sleep and was apprehensive about going out in public. Wayans's post has been reposted and could easily be viewable for years.

California courts have repeatedly held that the use of racial epithets can support a cause of action for intentional infliction of emotional distress. (*Alcorn v. Anbro Engineering, Inc.* (1970) 2 Cal.3d 493 [African-American plaintiff stated a cause of action for intentional infliction of emotional distress based upon allegations that his supervisor referred to him using the term "niggers" in a demeaning manner]; *Agarwal v. Johnson* (1979) 25 Cal.3d 932 [affirming jury verdict on the plaintiff's claim for intentional infliction of emotional distress based on conduct that included the use of racial epithets by the plaintiff's supervisor to humiliate him], disapproved on another point in *White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 574, fn. 4; *Robinson v. Hewlett-Packard Corp.* (1986) 183 Cal.App.3d 1108 [supervisor insulted plaintiff and his race in an employment setting].) A jury could reasonably find that Wayans's alleged conduct was outrageous, and I would

therefore permit Daniel's intentional infliction claim to proceed.[5]

## 4.    *Conclusion*

Accordingly, I would reverse the judgment and the order granting the anti-SLAPP motion and dismissing the complaint and direct the trial court to enter a new order partially granting the anti-SLAPP motion and striking the false light and Unruh Civil Rights Act causes of action in their entirety and paragraph 9(h) of the racial harassment claim.

LUI, J.

---

[5] On the other hand, I do not believe that Daniel demonstrated a reasonable probability of succeeding on the portion of his *racial harassment* claim concerning the Internet post.  Because Daniel did not even know about Wayans's Internet post until he got home and checked the Internet after his single day of employment on A Haunted House 2 had ended, the Internet post could not have created a hostile environment so severe as to interfere with his (already completed) work performance.  (*Thompson v. City of Monrovia* (2010) 186 Cal.App.4th 860, 876.)  Therefore, paragraph 9(h) of the complaint, which alleges the Internet posting, should have been stricken from Daniel's racial harassment claim.

15